Filed: February 9, 2010

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 06-4494
(1:01-cr-00455-LMB)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ZACARIAS MOUSSAOUI, a/k/a Shaqil, a/k/a Abu Khalid al
Sahrawi,

Defendant - Appellant.

--------------------------------------

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Amicus Supporting Appellant.

O R D E R

The court amends its opinion filed January 4, 2010, as
follows:

On page 2, attorney information section, the name "Barbara
Lynn Hartung, Richmond, Virginia" is deleted from line 1 following
"**ARGUED**" and added at lines 7 and 8 following "**ON BRIEF**" as counsel
for Appellant; the name "Justin S. Antonipillai" is deleted from
line 4 following "**ON BRIEF**" and added with "ARNOLD & PORTER, LLP,

Washington, D.C." at lines 1 and 2 following **"ARGUED"** as counsel

for Appellant.

For the Court - By Direction


 /s/ Patricia S. Connor

Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ZACARIAS MOUSSAOUI, a/k/a Shaqil,
a/k/a Abu Khalid al Sahrawi,

*Defendant-Appellant.*

⎫
⎬  No. 06-4494
⎭

NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,

*Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:01-cr-00455-LMB)

Argued: September 25, 2009

Decided: January 4, 2010

Before TRAXLER, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Gregory and Judge Shedd joined.

**COUNSEL**

**ARGUED**:  Justin S. Antonipillai, ARNOLD & PORTER, LLP, Washington, D.C., for Appellant.  Kevin R. Gingras, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Robert A. McCarter, Rebecca L. D. Gordon, Joseph M. Meadows, Robert Alexander Schwartz, Danielle M. Garten, Whitney A. Moore, ARNOLD & PORTER, LLP, Washington, D.C.; Barbara Lynn Hartung, Richmond, Virginia, for Appellant.  Chuck Rosenberg, United States Attorney, David J. Novak, Assistant United States Attorney, David Raskin, Assistant United States Attorney, David B. Goodhand, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; UNITED STATES DEPARTMENT OF JUSTICE, Appellate Section, Criminal Division, Washington, D.C., for Appellee. Joshua L. Dratel, LAW OFFICES OF JOSHUA L. DRATEL, PC, New York, New York; Theresa M. Duncan, Zachary Ives, FREEDMAN BOYD HOLLANDER GOLDBERG & IVES, PA, Albuquerque, New Mexico, for Amicus Supporting Appellant.

**OPINION**

TRAXLER, Chief Judge:

Zacarias Moussaoui pled guilty to six criminal conspiracy counts arising from the al Qaeda terrorist organization's plot to use commercial aircraft to commit terrorist attacks in this country, including the attacks that occurred on September 11, 2001.[1]   In a subsequent sentencing proceeding, the jury declined to impose the death penalty and the district court sentenced Moussaoui to life imprisonment without the possibility of release on all six counts, with the sentence on the

---

[1] "Al Qaeda" is transliterated from Arabic text. Several spellings may be acceptable for a single transliterated word. We follow the spelling conventions used by the parties.

first count to be served consecutively to the sentences on the other counts. In this appeal, Moussaoui challenges the validity of his guilty plea and his sentences. He has also filed a motion to remand, based upon the Government's disclosure of classified information during the pendency of this appeal. We affirm Moussaoui's convictions and sentences in their entirety and deny his motion to remand.

## I.  *Facts*

On August 16, 2001, Moussaoui, a French citizen, was taken into custody for overstaying his visa after he raised the suspicions of his instructor at the Pan American International Flight Academy in Eagan, Minnesota, where he was receiving pilot training on a jet simulator. Less than a month later, September 11, 2001, nineteen members of al Qaeda hijacked three commercial airlines and crashed them into the World Trade Center towers in New York City and the Pentagon in Virginia. A fourth airplane, apparently destined for the Capitol Building in Washington, D.C., crashed in a field in Pennsylvania after its passengers attempted to retake control of the airplane from the al Qaeda hijackers. Collectively, the 9/11 attacks resulted in the deaths of nearly 3,000 people. Moussaoui was still in custody, awaiting deportation, when the attacks occurred.

### A.  *Procedural History*

#### 1.  *The Indictment*

In December 2001, Moussaoui was indicted for his participation in the conspiracies that led to the 9/11 attacks. The second superseding indictment (the "Indictment"), to which he would later plead guilty, charged him with (1) conspiracy to commit acts of terrorism transcending national boundaries, *see* 18 U.S.C.A. §§ 2332b(a)(2), (c) (West 2000); (2) conspiracy to commit aircraft piracy, *see* 49 U.S.C.A. § 46502(a)(1)(A), (a)(2)(B) (West 2007); (3) conspiracy to

destroy aircraft, *see* 18 U.S.C.A. §§ 32(a)(7), 34 (West 2000 & Supp. 2009); (4) conspiracy to use weapons of mass destruction, *see* 18 U.S.C.A. § 2332a(a) (West 2000); (5) conspiracy to murder United States employees, *see* 18 U.S.C.A. §§ 1114, 1117 (West 2000 & Supp. 2009); and (6) conspiracy to destroy property of the United States, *see* 18 U.S.C.A. § 844(f), (i) (West 2000 & Supp. 2009). The Indictment identified 110 overt acts committed by Moussaoui and his al Qaeda co-conspirators, both in the United States and abroad, including the 9/11 attacks.

## 2.  *Appointment of Counsel*

Upon his indictment, the district court appointed Frank Dunham and Gerald Zerkin, from the Federal Public Defender's Office, and Edward MacMahon, a private practitioner, to represent Moussaoui. The court informed Moussaoui that, although counsel had been appointed for him, he had the right to retain private counsel if he was able to do so. At the arraignment on January 2, 2002, Moussaoui entered "no plea," which the district court interpreted to be a plea of not guilty. J.A. 55.

On January 7, 2002, the Department of Justice imposed Special Administrative Measures (SAMs) on Moussaoui. "SAMs are restrictions placed on a prisoner in the interests of national security." *United States v. Abu Ali*, 528 F.3d 210, 243-44 (4th Cir. 2008); 28 C.F.R. § 501.3(a) (2008) (providing for the imposition of SAMs where the Attorney General determines that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons"). The SAMs were imposed to prevent Moussaoui from passing coded messages to or otherwise communicating with other terrorists. The SAMs permitted Moussaoui to have unmonitored attorney/client and consular communications and mail, monitored visits and telephone calls with immediate family, and monitored mail with all others. Approved mail would be forwarded

to defense counsel for distribution to Moussaoui and Moussaoui would be notified of any seized mail.

Because the case involved classified national security information, the Government also sought and received a protective order (the "Protective Order") under the Classified Information Procedures Act (CIPA). *See* 18 U.S.C.A. app. 3, § 3 (West 2000). Under the terms of the Protective Order, access to classified information produced by the Government in discovery was restricted to persons with the necessary security clearances, which included defense counsel. The Protective Order therefore allowed disclosure of classified information to defense counsel, but not to Moussaoui personally unless the Government consented or the district court determined that making it available was necessary.

The relationship between Moussaoui and his appointed attorneys was strained at best, and Moussaoui almost immediately began demanding to proceed *pro se*, but with the assistance of Muslim counsel. In April 2002, counsel for Moussaoui filed a motion requesting that the SAMs restrictions be lifted to permit Moussaoui to have an unrestricted visit with "[a]n Islamic scholar, referred to . . . as John Doe." J.A. 145. Counsel explained that the scholar would consult with Moussaoui and the attorneys so as to improve the "communication and understanding between them," but that the scholar was unwilling to undergo the vetting process required by the SAMs. J.A. 145. The Government opposed the motion, arguing that the pre-clearance requirement was "one of the cornerstone requirements of the SAM[s] as it [ ] prevents a miscreant sympathizer from meeting with Moussaoui and passing on or receiving deadly information (names of witnesses not yet publicly revealed, etc.), as called for in the *al Qaeda* terrorism manual." J.A. 187. The district court ultimately denied the motion, concluding that the Government's allegations against Moussaoui were supported by probable cause and that it would be too dangerous to allow an unnamed "John Doe" unfettered access to Moussaoui.

At the hearing held on the motion to lift the SAMs, however, Moussaoui stated that he in fact never had any intention of speaking with John Doe and that his request was simply an excuse to come to court so he could move to proceed *pro se*. Moussaoui complained that his appointed attorneys had "no understanding of terrorism, [Islam, or] Mujahedin," J.A. 232, and that the Government was "preventing any Muslim help" from reaching him, J.A. 223. Moussaoui told the court that he intended "to hire[ ] [his] own chosen Muslim lawyer to assist [him] in matters of procedure and understanding of the . . . law." J.A. 220. Moussaoui explained, however, that he sought Muslim counsel only for assistance with witnesses and material necessary for his defense, and that no attorney—including any Muslim counsel chosen by Moussaoui—would ever represent him. Moussaoui also demanded that the court "not . . . engage in any communication or relation with [his] Muslim lawyer, concerning any aspect of [his] case." J.A. 215.

The district court advised Moussaoui that he had the right to proceed *pro se* and the right to hire an attorney at his own expense but that Moussaoui could not pick the attorney to be appointed for him. The district court explained that because there was classified information protected by the Protective Order, Moussaoui would not have "totally unrestricted choice even if [he had] the money available to hire an attorney, because the attorneys . . . have to be able to be cleared to receive some of the information in this case." J.A. 246.

After Moussaoui moved to proceed *pro se*, appointed counsel requested a competency evaluation. They also filed a motion seeking to grant Moussaoui full access to the classified discovery information and seeking relief from the SAMs if the district court granted Moussaoui's request to proceed *pro se*. In connection with these motions, defense counsel advised that the Government had added several Muslim attorneys to the list of counsel cleared to see Moussaoui at their request, but that "this process will not work if Mr. Moussaoui

is granted *pro se* status such that current counsel no longer act for him." J.A. 444 n.9.

After lengthy proceedings, the district court found that Moussaoui was competent and that Moussaoui had validly waived his right to counsel. However, given the complex nature of the case and the existence of classified discovery information, the district court determined that "standby" counsel would be required to assist Moussaoui.

Moussaoui told the district court that he had been allowed to meet with a Muslim attorney who had agreed to represent him *pro bono*. Moussaoui made it clear, however, that he still intended to represent himself, because "it [was] not possible for [Moussaoui] to entrust [his] life to somebody else." J.A. 527. Moussaoui thus explained that this attorney would only work as his assistant *outside* the court, but not as counsel of record.

Because Moussaoui's *pro bono* counsel had not yet made an appearance, the court ordered existing attorneys to remain in the case as standby counsel until Moussaoui's chosen attorney made an appearance. The district court advised Moussaoui that any attorney assisting him would have "to comply with the rules of ethics and behavior," J.A. 527, and associate local counsel under the district court's local rules if the attorney was not licensed to practice law in Virginia. The attorney would also have to pass at least a preliminary FBI background check before the attorney would be permitted to help Moussaoui. The court also informed Moussaoui that Randall Hamud, a Muslim attorney hired by Moussaoui's mother, was in the courtroom, but Moussaoui refused to meet with him.

Problems persisted between Moussaoui and his appointed attorneys, so the district court dismissed MacMahon and appointed Alan Yamamoto as additional standby counsel. The court ruled that if *pro bono* counsel had not entered an appearance by June 28, 2002, an additional standby attorney

would be appointed to replace the federal public defenders. The district court advised Moussaoui that Yamamoto was available to help him "locate witnesses and evidence," and that Yamamoto would "be invaluable to any *pro bono* counsel . . . unfamiliar with the practices of this Court." J.A. 575.

Moussaoui immediately objected and identified Charles Freeman, a Muslim attorney from Texas, as his attorney of choice. However, in keeping with his prior statements, Moussaoui explained that "Bro[ther] Freeman [was] only a legal consultant" and that Moussaoui would "never, under any circumstance, use him [or] appoint him as a standby lawyer." J.A. 628. Moussaoui requested that appointed counsel be dismissed and that Freeman be allowed to appear as his "legal consultant" or "advisor" at upcoming proceedings. J.A. 629.

Freeman, however, did not enter an appearance by June 28, as required by the district court, nor had he passed the FBI background check by that date. The district court therefore denied Moussaoui's motion to remove appointed counsel and to allow Freeman to assist him. The court explained that

> Mr. Freeman is not licensed to practice law in the Commonwealth of Virginia, has not been admitted to practice before this court, has not been admitted to practice in this case *pro hac vice* as required by [the local rules], and has not entered an appearance in this case. He may already have violated [the local rules] by submitting two pleadings, which have been filed for administrative purposes only, but will not be considered by the Court. Because Mr. Freeman has not been qualified to lawfully represent the defendant in this court, he may not sit inside the well of the court at the defendant's June 25, 2002 re-arraignment. He may, however, attend court proceedings as a member of the public.

J.A. 657. The following day, Freeman advised the court in writing that:

> I never intended to assist Bro[ther] Moussaoui by appearing as any so-called standby counsel because I refuse to be a toothless paper tiger amounting to absolutely no counsel at all. Unless and until Bro[-ther] Moussaoui asks me to represent him as his lawyer, if he ever asks, I will only provide out-of-court legal assistance to him solely on federal law.

J.A. 659-60 (footnotes omitted). Freeman made it clear that he was "not, by filing th[e] pleading, entering any appearance at all in the . . . prosecution," J.A. 659 n.1, and that the "request should not be construed by anyone as an appearance before this Honorable Court because it is not," J.A. 663 n.8.

At this point in the proceedings, then, Moussaoui had rejected the help of Yamamoto (in addition to the initial three appointed attorneys), and Moussaoui had rejected all attempts by the court, appointed counsel, the Government, and his mother to assist him in obtaining Muslim counsel. In addition, Freeman, whose services Moussaoui had sought, had refused to enter an appearance and assume the role of standby counsel. Concluding that no appointed attorney would ever satisfy Moussaoui, the court ruled that the federal public defenders and Yamamoto would remain as standby counsel, and reappointed MacMahon. The court encouraged Moussaoui to "reconsider his refusal to communicate with these lawyers, who [were] poised to help him obtain experts, locate witnesses and even provide the paper supplies he needs to mount his defense." J.A. 787. The court warned Moussaoui that his "continued unreasonable refusal to interact with standby counsel [was] only hurting his defense." J.A. 787-88.

Throughout the remainder of the proceedings, Moussaoui periodically renewed his complaints concerning Freeman, asserting that the court's refusal to allow the access he demanded left him with no "meaningful way to defend" himself. J.A. 695. The district court repeatedly advised Moussaoui that he was not entitled to advisory counsel of his

choice, particularly where such counsel was unwilling to enter a formal appearance and be bound by the rules of the court. *See United States v. Singleton*, 107 F.3d 1091, 1100-03 (4th Cir. 1997) (finding that a *pro se* defendant does not have a right to an intermediate accommodation such as "advisory" counsel).

### 3. *The July 2002 Guilty Plea Attempt*

On July 18, 2002, Moussaoui informed the court that he had knowledge of the 9/11 attacks, knew "exactly who d[id] it, . . . which group, who participated, [and] when it was decided," and wanted to plead guilty. J.A. 858-59. Moussaoui stated that he believed that the guilty plea would "save [his] life, because the jury [would] be . . . able to evaluate how much responsibility [he] ha[d]." J.A. 858. After warning Moussaoui that his words could be used against him and suggesting that the Government might enter into plea negotiations with him, the district court gave Moussaoui a week to consider his decision. Defense counsel again challenged Moussaoui's competency and renewed their concerns regarding Moussaoui's access to the classified discovery, asserting that "there is exculpatory evidence which has not been provided to him and that his plea of guilty may mean that he might never have the benefit of such information to use to contest his guilt." J.A. 866.

At the scheduled Rule 11 hearing, *see* Fed. R. Crim. P. 11,[2]

---

[2]The district court first offered to postpone the hearing to allow Moussaoui additional time to consult with Professor Sadiq Reza from the New York Law School, another Muslim attorney who had met with Moussaoui in an effort to establish a relationship. Moussaoui declined. He did, however, persist in his demands regarding access to Freeman, and the court again advised Moussaoui that access was contingent upon Freeman's compliance with the requisite rules and orders governing such representation:

> I'll say it one more time. The SAM[s] say[ ] you get the right to unmonitored visits only with the attorney of record. . . . All this

Moussaoui again expressed his belief that the jury might find him more credible and decline to impose the death penalty if he pled guilty. However, Moussaoui was ultimately unwilling to admit to the facts necessary to support a guilty plea to the charged conspiracies and withdrew his request.

## B.  *The First Appeal*

Beginning in September 2002, Moussaoui sought access to several al Qaeda associates in the custody of the United States government (the "enemy combatant witnesses" or "ECWs"), who Moussaoui believed would be helpful to his defense. The district court agreed, and ordered the Government to produce three of the ECWs for depositions under Rule 15,[3] but denied access to the remainder because Moussaoui had failed to establish that they would provide material, admissible testimony. *See United States v. Moussaoui*, 382 F.3d 453, 458 n.4 (4th Cir. 2004) ("*Moussaoui II*"). As discussed in more detail below, we reversed the district court's decision granting Moussaoui access to the ECWs and remanded the case for the preparation of substitutions that would provide Moussaoui with substantially the same ability to make his defense. *See id.* at 456-57. On March 21, 2005, the Supreme Court denied review of our decision.

---

Court has said is that Mr. Freeman cannot and does not qualify as an attorney of record because he has consistently made it clear that he is not entering an appearance on your behalf. . . . [H]e could get admitted to practice here if he followed the local rule. So we have a lawyer who is not admitted to practice in this district, who is not the attorney of record representing you. Therefore, under the SAM[s], he is no different from any member of the public. Now, members of the public can write to you under the SAM[s]. That letter would be reviewed by an FBI agent, and if there was no objection to it, it would go to you.

J.A. 1040-41.

[3]Rule 15(a)(1) of the Federal Rules of Criminal Procedure provides that a court may order depositions of witness to preserve testimony for trial "because of exceptional circumstances and in the interest of justice."

During the pendency of the earlier appeal, the district court revoked Moussaoui's right to proceed *pro se*. Since October 2003, the district court had received over twenty filings from Moussaoui, "most of which [were] not proper requests for appropriate judicial relief." J.A. 1368. These filings "include[d] veiled, and in some cases overt, threats to public officials, attacks on foreign governments, attempts to communicate with persons overseas, and efforts to obtain materials unrelated to this case." J.A. 1368.[4] After the district court specifically warned Moussaoui that he might lose his right to continue *pro se* if he continued this course, Moussaoui filed two additional improper pleadings, and the district court revoked Moussaoui's *pro se* status.[5] Moussaoui would later testify that his writings were intentionally designed to promote his agenda of disseminating propaganda about al Qaeda's war against the United States.

## C.  *The Guilty Plea*

On March 29, 2005, eight days after the United States Supreme Court denied certiorari review of our decision in *Moussaoui II*, Moussaoui informed the court that he wanted to enter an unconditional plea of guilty to all counts in the Indictment.

---

[4]*See e.g.*, J.A. 1287 ("Emergency Strike by Slave of Allah Mujahid Zacarias Moussaoui to counter Dirty Insider Dealing by Fat Megalo Dunham for his Chief Pay Persecution Master Ashcroft (a/k/a United Satan Chief Liar) and to Have Fat Megalo Out of 9/11 Circus Trial"); J.A. 1359 ("$100000 Cash in for 'Victim Impact' Extravaganza (a/k: Sucking Scavenger made in U.S.A.)"); J.A. 1358 ("20th Hijacker $100000 American Tax Payers for 3000+ Americans Dead Head Account").

[5]*See* J.A. 1374 (20th Hijacker: Leonie You Bitch, But ZM must get the Wicked Tyran Congress 9/11 Report!"); J.A. 6289 ("20th Hijacker: Real Bitch of Leonie Brinkema position on Uncle Sam").

## 1. *The Rule 11 Proceeding*

In light of the prior attempt to plead guilty and the publicity surrounding the case, the district court first held, with the consent of the Government, an *ex parte* hearing with Moussaoui and Yamamoto to discuss the guilty plea.[6] Yamamoto advised the court that Moussaoui was "now willing to accept responsibility for the events of 9/ll." 2 Supp. J.A. 55.[7] Yamamoto represented that he had discussed with Moussaoui his appeal rights regarding the ECWs and advised Moussaoui that those issues would be waived, except with regard to the penalty phase. Moussaoui stated that he had received a letter from defense counsel and had "plenty of discussion[s] with Mr. Yamamoto." 2 Supp. J.A. 45. According to Moussaoui, "they have pour[ed] on me all their so-called legal advice. . . . So I have heard them, I have read them, I understand what they say, but we do not agree. That's all. But somehow they can't take that I don't . . . agree with them." 2 Supp. J.A. 44-45. Moussaoui stated that he was "voluntar[ily] choosing this course of action" and exercising his "privilege . . . to plead guilty [and] testify on [his own] behalf." 2 Supp. J.A. 44-45. With regard to the effect of a guilty plea on Moussaoui's right to assert other claims, Moussaoui told the district court:

> We could stay all day here, and I would flood you with reasons, and you have no interest in it. What is certain . . . is I've listened to their advice, read. . . the *Blackledge v. Perry*[8] case [they sent] with the

---

[6]Although Moussaoui initially refused to communicate with any of his appointed counsel, he later testified that he began communicating with Yamamoto because Yamamoto was polite to him.

[7]The parties have submitted numerous joint appendices in this appeal. Unclassified appendices are designated "J.A." Classified appendices are designated "J.A.C." Supplemental appendices are so designated, with, where necessary, the number of the supplemental appendix noted –- *i.e.*, "2 Supp. J.A."

[8]Moussaoui was referring to *Blackledge v. Perry*, 417 U.S. 21, 29-30 (1974), discussed *infra*, which addresses the effect of a guilty plea on the right to challenge pre-plea constitutional violations.

statement of the Supreme Court, who made abso-
lutely clear that once you have pled guilty, you can-
not raise any . . . claim relating to deprivation of
constitutional rights . . . that occur[s] prior to the
entry of the guilty plea. This is the word of the
Supreme Court.

2 Supp. J.A. 59.

The district court found no indication that Moussaoui had
been coerced to plead guilty, noting that "[i]f anything, the
coercion has been for him not to plead." 2 Supp. J.A. 67. The
court further found that Moussaoui had received "full advice
of counsel," but observed that "[a] defendant in our system
has an absolute right to reject that advice. It does not make
him incompetent, and it does not make him unwise, and in
some cases, who knows, it might have been the better deci-
sion." 2 Supp. J.A. 67. Satisfied that Moussaoui was compe-
tent, the district court concluded that Moussaoui understood
the ramifications of pleading guilty and that Moussaoui's plea
was knowing and voluntary.

On April 22, 2005, the district court conducted a public
plea colloquy under Rule 11 of the Federal Rules of Criminal
Procedure, reviewing each of the six counts charged and
advising Moussaoui of the maximum penalties he faced.
Moussaoui confirmed that he had received a copy of the
Indictment long ago and "kn[ew] very much what it's talking
about." J.A. 1419. The district court explained to Moussaoui
that he would be waiving his right to subsequently challenge
his guilt and his right to raise other issues that arose prior to
the guilty plea, including the issues regarding access to the
ECWs.

Yamamoto advised the court that he had also discussed the
consequences of the guilty plea with Moussaoui and that
Moussaoui "appear[ed] to understand it." J.A. 1434. Yama-
moto also advised that Moussaoui had "responded appropri-

ately when [he had] spoken to him" and, while they had "disagreements . . . with respect to certain items[,] [t]hose disagreements were appropriate disagreements." J.A. 1434.

## 2.  *The Statement of Facts*

In connection with his guilty plea, a written statement of facts (the "Statement of Facts") was prepared, detailing the facts pertaining to al Qaeda's plans for terrorist attacks in the United States, Moussaoui's association with al Qaeda, and the steps Moussaoui took to prepare for the operation and to protect it after he was detained. When he signed the document, Moussaoui added the designation "20th Hijacker" to his signature. J.A. 1413. A summary of the Statement of Facts, as adopted and executed by Moussaoui, follows.

Al Qaeda is "an international terrorist group" founded by Usama Bin Laden (hereinafter "Bin Laden"), that is "dedicated to opposing the United States with force and violence." J.A. 1409. The head of its military committee was Mohammed Atef, a/k/a Abu Hafs al-Masri (hereinafter "al-Masri"). Al Qaeda members pledge "bayat" to Bin Laden and al Qaeda, J.A. 1409, meaning that they "give allegiance to Bin Laden and the group." J.A. 1671. Since 1996, al Qaeda has been headquartered in Afghanistan, but it associates with terrorists in other parts of the world to further its goals.

In the mid-1990s, Bin Laden issued a fatwah (or religious ruling) declaring jihad (or war) against the United States and its allies, sanctioning the killing of United States military and civilians alike. In furtherance of these aims, "Bin Laden and al Qaeda provided and supported training camps and guesthouses in Afghanistan, including camps known as al Farooq and Khalden." J.A. 1409. The training "camps were used to instruct members and associates of al Qaeda and its affiliated groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction." J.A. 1409.

In connection with al Qaeda's declaration of war, "al Qaeda members conceived of an operation in which civilian commercial airliners would be hijacked and flown into prominent buildings, including government buildings, in the United States." J.A. 1410. In preparation for the attacks, "al Qaeda associates entered the United States, received funding from abroad, engaged in physical fitness training, and obtained knives and other weapons with which to take over airliners." J.A. 1410. Some of these "associates obtained pilot training, including training on commercial jet simulators, so they would be able to fly hijacked aircraft into their targets." J.A. 1410. "Bin Laden personally approved those selected to participate in the operation, who were willing to die in furtherance of their religious beliefs and al Qaeda's agenda." J.A. 1410.

Moussaoui was a member of al Qaeda and pledged bayat to Bin Laden. He trained at al Qaeda's Khalden Camp and managed an al Qaeda guesthouse in Kandahar, "a position of high respect within al Qaeda." J.A. 1410. Moussaoui communicated directly with Bin Laden and al Masri while in Afghanistan. He "knew of al Qaeda's plan to fly airplanes into prominent buildings in the United States" and "agreed to travel to the United States to participate in the plan." J.A. 1410. As he did with the other hijackers, Bin Laden personally selected Moussaoui to participate in the planes operation and approved Moussaoui to attack the White House, which had been Moussaoui's dream.

In preparation for the operation, the al Qaeda leadership first sent Moussaoui to Malaysia to explore flight training. They also provided him with information about flight schools in the United States. In September 2000, Moussaoui contacted Airman Flight School in Norman, Oklahoma. Moussaoui's intent was to obtain pilot training to further "al Qaeda's plan to use planes to kill Americans." J.A. 1411. "On February 23, 2001, Moussaoui traveled from London to Chicago and then on to Norman, Oklahoma," where he enrolled at Airman

Flight School and began pilot training on small planes. J.A. 1411. Like his co-conspirators, he joined a gym and purchased knives, intentionally selecting knives with blades short enough to pass through airport security.

In the summer of 2001, Moussaoui was instructed by an al Qaeda associate to train on larger jet planes. Ramzi Bin al-Shibh, another al Qaeda operative, sent Moussaoui a wire transfer of money from Germany to the United States to pay for the flight training. Shortly thereafter Moussaoui enrolled at the Pan American International Flight Academy in Eagan, Minnesota, and began simulator training for a Boeing 747-400. Moussaoui told another al Qaeda associate that his simulator training would be completed before September 2001.

At the time of his arrest, Moussaoui was in possession of knives, flight manuals for the Boeing 747-400, a flight simulator computer program, fighting gloves and shin guards, a piece of paper referring to a handheld Global Positioning System ("GPS"), software that could be used to review pilot procedures for the Boeing 747-400, and a hand-held aviation radio. When questioned after his arrest, Moussaoui "lied to federal agents to allow his al Qaeda 'brothers' to go forward with the operation." J.A. 1412. He "falsely denied being a member of a terrorist organization and falsely denied that he was taking pilot training to kill Americans." J.A. 1412. He told the "agents that he was training as a pilot purely for his personal enjoyment and that, after completion of his training, he intended to visit New York City and Washington, D.C., as a tourist." J.A. 1412. The attacks of 9/11 happened less than a month after Moussaoui's arrest.

At the *ex parte* guilty plea proceeding, Moussaoui advised the court that he had read the Statement of Facts "more than probably ten time[s]." 2 Supp. J.A. 45. Moussaoui made a single correction to the Statement of Facts, changing the date that he told his al Qaeda associate that he would finish jet simulator training from "by August 20, 2001" to "before Sep-

tember 2001." 2 Supp. J.A. 45-46. At the public Rule 11 hearing, Moussaoui confirmed that he had received a revised copy of the Statement of Facts, which had been corrected in accordance with his request at the *ex parte* hearing.

### 3.  *Acceptance of the Plea*

At the conclusion of the Rule 11 hearing, the district court made the following findings and conclusions:

> I have previously found based on a rather unusual hearing that was done on the record with Mr. Moussaoui and Mr. Yamamoto present that I am fully satisfied that Mr. Moussaoui is completely competent to enter his guilty pleas today. The defendant has acted against the advice of his counsel, but he has clearly exhibited both today and earlier this week a complete understanding of the ramifications of his guilty pleas.

> Mr. Moussaoui is an extremely intelligent man. He has actually a better understanding of the legal system than some lawyers I've seen in court. I reread the transcript from the plea hearing of two-and-a-half years ago, and he . . . understood then and I have no reason to believe he does not understand now the nature of conspiracy law.

> The full reasons for my finding the defendant competent, I think, are adequately expressed in the transcript of that hearing . . . but I am satisfied, Mr. Moussaoui, that you have entered these guilty pleas in a knowing and voluntary fashion. You have intentionally disregarded the advice of counsel. That is your right in our legal system.

> The Court is also satisfied that the written statement of facts which you have had several days to

carefully go over and you have had the advice and consultation of Mr. Yamamoto is more than sufficient evidence to establish your guilt beyond a reasonable doubt as to all six counts.

J.A. 1435-36.

### D.  *The Sentencing Proceeding*

Because the Government sought the death penalty under the Federal Death Penalty Act ("FDPA"), *see* 18 U.S.C.A. §§ 3591-3599 (West 2000 & Supp. 2009), the district court conducted a bifurcated capital sentencing proceeding before a jury. The first phase ("Phase I") was to determine whether the Government had proven a statutory death-eligibility factor, and the second phase ("Phase II") was to determine whether the death penalty would be imposed.

During Phase I, the Government presented extensive evidence regarding the conspiracies alleged in the Indictment, including evidence of the activities of the 9/11 hijackers and Moussaoui in the months preceding the 9/11 attacks, the similarities between Moussaoui's actions and those of the 9/11 hijackers, and the overlap between the al Qaeda leadership directing them all. Moussaoui also testified, confirming his participation in the conspiracies.

Moussaoui testified that al-Masri asked him to be a part of the planes operation in the winter of 1999. Moussaoui ultimately agreed and began training for his mission, which was to fly a fifth plane on 9/11 into the White House. Moussaoui specifically denied he was scheduled to be a fifth hijacker on the flight that crashed in Pennsylvania, testifying that he signed the Statement of Facts as the "20th hijacker" as "a bit of fun," "[b]ecause everybody used to refer to [him] as the 20th hijacker." J.A. 3877.

When sent to Malaysia to obtain flight training, Moussaoui was hosted by members of Jemaah Islamiyah (hereinafter

"JI"), an al Qaeda-affiliated terrorist group. Moussaoui testified that he had problems with JI when he was in Malaysia – he talked too much about his mission and was involved in an unnecessary purchase of explosives. Because of those problems, the al Qaeda leaders temporarily excluded Moussaoui from the planes operation. Although he was later re-included in the operation, his position remained under review. According to Moussaoui, time was of the essence and al-Masri told him to "just go to America" and that he would "be informed of what [he] need[ed] to know in due time." J.A. 3954. Moussaoui testified that al-Masri told him to communicate with Khalid Sheikh Mohammed (hereinafter "KSM"), the so-called "mastermind" of the planes operation.

In February 2001, Moussaoui arrived in the United States with $35,000 in cash and a fake business letter given to him by a JI member to use as cover for his presence in this country. He immediately traveled to Airman Flight School to begin his pilot training. Moussaoui contacted the Pan Am Flight Academy in May 2001 and was offered enrollment for $8,300, for classes beginning in mid-August 2001. Moussaoui sent the school a $1,500 deposit. Mustafa Ahmed al-Hawsawi, an al Qaeda operative, first transmitted money to Bin al-Shibh in Germany, who in turn transmitted money to Moussaoui. Moussaoui informed KSM that he would be out of jet simulator training before September 2001. Moussaoui's roommate, Hussein al-Attas, accompanied him on the trip to Minnesota, where he began his training on August 13 at Pan Am. Moussaoui told al-Attas that they would go to New York City when he completed his training "to see the sites." J.A. 3226. Before he left for the United States, Moussaoui bought knives to use to take over the plane and, if necessary, kill passengers or flight attendants. He was in the process of obtaining a GPS device when he was arrested.

Moussaoui testified that he did not know specifics of the planned operation, but knew there were other al Qaeda associates in the United States and that the hijacking plot was in

the works when he was arrested. Moussaoui knew that the White House was a target, as were the World Trade Center towers, and he knew that additional planes would fly as part of the mission. Because he had been told that there was time pressure for him to finish his training and because he had conveyed the message that he would be ready before September, Moussaoui expected the attacks to occur shortly after August 2001. Moussaoui testified that he lied to the agents when he was arrested "because I'm al Qaeda" and "at war with this country," J.A. 3881, and because he "wanted [his] mission to go ahead," J.A. 3882. While he was in custody, the 9/11 hijackers finalized their plans, bought plane tickets and knives, and returned unused money to al-Hawsawi.

The substituted statements of KSM and several other terrorists were also admitted as evidence during the sentencing proceedings. Although much of this evidence was inculpatory, portions contradicted Moussaoui's testimony that he was supposed to participate in the 9/11 strikes, instead indicating that Moussaoui was to fly in a planned second wave of attacks. Other portions of this evidence confirmed problems Moussaoui had in Malaysia and the United States while preparing for his mission, portraying Moussaoui as an unpredictable operative prone to violations of al Qaeda's rules regarding operational security.

According to KSM, Bin Laden first pursued the idea of the planes operation in 1998. KSM stated that the planes operation included plans for a first and second wave of attacks and that "the original plan called for Moussaoui to lead the [second] attack operation in the [United States]." J.A. 3998.[9] The first wave of attacks was to be carried out by Arab al Qaeda associates on the East Coast. The second wave of attacks was to be carried out by non-Arab associates (such as Moussaoui) on the West Coast because KSM believed the non-Arabs

---

[9]For ease of reading, all internal quotations marks from the statements have been omitted.

would still be able to operate in the heightened security expected after the first wave. For this reason, KSM stated that Moussaoui would not have been used in the first wave even if a hijacker pulled out. KSM stated that Moussaoui's preparations for the "second wave attack . . . entailed the same steps as the September 11 hijackers: getting flight lessons, purchasing knives, etc.," J.A. 3988, and that the efforts for the second wave began in parallel with the first wave. KSM confirmed that Moussaoui was sent to Malaysia to obtain flight training in late 1999, and that he caused problems with the JI group. KSM did not think Moussaoui was "a suitable operative" and asked Bin Laden and al-Masri to remove him from the operation. J.A. 4023. However, "Moussaoui lobbied [al-Masri] and Bin Laden to use him in operations, and their pressure compelled [KSM] to include him in the second wave plan." J.A. 4021.

KSM also confirmed that Moussaoui was sent to the United States for flight training and that he was Moussaoui's contact. After several security missteps by Moussaoui, however, KSM became exasperated and turned Moussaoui over to Bin al-Shibh. According to KSM, "Moussaoui did not have any particular personality flaws, but . . . had a different state of mind from other operatives because he had been raised in the [W]est." J.A. 4026. In particular, he had a "high level of self-confidence" and "a hard time taking instructions." J.A. 4026. Nonetheless, "[d]espite [this] admittedly problematic personality, [KSM] tasked Moussaoui to take flight lessons in preparation for the second wave attacks." J.A. 4019. According to KSM, the "plan for a second wave attack ended with Moussaoui's arrest." J.A. 4022.[10]

---

[10]The statements of al-Hawsawi and al-Kahtani were also presented to the jury during this phase. Among other things, both witnesses provided statements indicating that al-Kahtani was sent to the United States in August 2001 to "complete the group" of 9/11 hijackers. J.A. 4063. This was consistent with Moussaoui's testimony that he was not the 20th hijacker.

At the conclusion of Phase I, the jury found the requisite death eligibility factor and moved on to Phase II, to determine whether to impose the death penalty. During this phase, Moussaoui again exercised his right to testify and, among other things, elaborated upon his relationship with counsel. Moussaoui told the jury that he wanted to advance two arguments in his defense: first, that "jail [was] a greater punishment than . . . being sentenced to death, and [that] martyrdom, execution, [would] be a reward" and, second, that the jury "could save [an] American life by keeping [him] alive because they could use [him] as a bargaining chip, so if one day some American serviceman [is] taken hostage in Iraq or Afghanistan, they could . . . exchange Moussaoui [for] the American soldier." J.A. 4433. Moussaoui testified that the "jury might spare the death penalty to their enemy, but . . . not to a coward liar," J.A. 4480, and that "by testifying truthfully, I will save my life," J.A. 4482. Moussaoui criticized counsel's plan to assert that he was mentally ill, which he believed would not "explain [his] train[ing] on the 747-400, [the] large amount of cash [he was given], or his traveling to Malaysia." J.A. 4435.

Moussaoui also addressed the passionate and offensive documents that he had filed during the course of his prosecution, including pleadings asserting that the district court judge was trying to kill him, referring to them as "psychological warfare pro[pa]ganda." J.A. 4429. Moussaoui explained to the jury that "when I saw something that I believe[d] I could exploit or I could [use to] psychologically damage you, whatever, by propaganda, I will do it." J.A. 4484. Moussaoui also admitted that he told his psychologist that his *pro se* pleadings were being published and that "Muslim people around the world have . . . been made happy or have been motivated by them." J.A. 4484.

Moussaoui's sentencing strategy appears to have worked. The jury declined to impose the death penalty. In addition, not a single juror found that Moussaoui suffered from a psychotic

disorder, or that his testimony about his plan to fly a plane into the White House was unreliable or contradicted by his other statements. Moussaoui was sentenced by the district court to six terms of life imprisonment without the possibility of release, with the sentence on the first count to be served consecutively to the remaining five.

At no point during the sentencing proceedings, nor prior to the actual sentencing, did Moussaoui seek to withdraw his guilty plea. On the contrary, Moussaoui *twice* took the stand and confirmed his guilt. Four days after he avoided the death penalty and was sentenced to life imprisonment, however, Moussaoui filed a motion to withdraw his plea, claiming that his "understanding of the American legal system was completely flawed" and asking for a new trial "[b]ecause I now see that it is possible that I can receive a fair trial . . . even with Americans as jurors and that I can have the opportunity to prove that I did not have any knowledge of and was not a member of the plot to hijack planes and crash them into buildings on September 11, 2001." 2 Supp. J.A. 435 (internal quotation marks omitted). In other words, Moussaoui sought to withdraw his guilty plea (and contradict the sworn testimony he had just given) because he had been successful in the penalty phase proceedings. Moussaoui also claimed that he had proceeded *pro se* only because "the [SAMs] prevented me from seeking and obtaining a Muslim lawyer of my choice" and that "Brother Charles Freeman, a Muslim attorney, was not permitted to be my lawyer." J.A. 5622.

The district court denied the motion to withdraw the guilty plea. *See* Fed. R. Crim. P. 11(e) (providing that "[a]fter the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack."). This appeal followed.

## II.   *Discussion*

"[A] guilty plea is a grave and solemn act to be accepted only with care and discernment." *Brady v. United States*, 397

U.S. 742, 748 (1970). It "comprehend[s] all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." *United States v. Broce*, 488 U.S. 563, 569 (1989).

In order for a guilty plea to be valid, the Constitution imposes "the minimum requirement that [the] plea be the voluntary expression of [the defendant's] own choice." *Brady*, 397 U.S. at 748. Because it operates as a waiver of important constitutional rights, the plea must also be entered "knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady*, 397 U.S. at 748). It must reflect "a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In evaluating the constitutional validity of a guilty plea, "courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness." *Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) (internal citation omitted).

When Moussaoui executed the Statement of Facts at the Rule 11 hearing in April 2005, he clearly admitted "that he committed the acts charged in the [I]ndictment." *Brady*, 397 U.S. at 748. He confirmed that he had been advised of and understood that his guilty plea would bar any challenge to pre-plea constitutional violations. He also represented that he was entering the plea knowingly, voluntarily, and with (but against) the advice of his counsel. During the sentencing proceeding, Moussaoui confirmed the admissions made in the Statement of Facts, adding that his specific mission was to fly a fifth plane into the White House on 9/11.

Nevertheless, Moussaoui now challenges his guilty plea, asserting (1) that various pre-plea rulings by the district court violated his constitutional rights, rendering his plea involuntary as a matter of law; (2) that his plea was not knowingly

entered because he had not yet been made privy to certain classified, exculpatory evidence when he pled guilty; (3) that his plea was not properly counseled because counsel were prohibited from discussing the substance of this classified, exculpatory evidence with him at the time of the plea; (4) that his plea should not have been taken in the absence of further competency evaluations; and (5) that the plea colloquy otherwise failed to comply with Rule 11 of the Federal Rules of Criminal Procedure. We address each claim seriatim.

### A.   *The "Voluntarily Entered" Challenge*

We begin with Moussaoui's claim that his plea was involuntary as a matter of law because the district court issued several pre-plea rulings that violated his Fifth and Sixth Amendment rights to obtain counsel of his choice; to have personal, pretrial access to classified, exculpatory evidence; to communicate with his counsel about this evidence; to effectively proceed *pro se*; to be present during critical stages of the proceedings; and to have compulsory process to present the ECWs at trial. These claims, all of which preceded his guilty plea, are not cognizable on appeal.

"When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea." *United States v. Bundy*, 392 F.3d 641, 644 (4th Cir. 2004). The "guilty plea represents a break in the chain of events which has preceded it in the criminal process." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Thus, the defendant who has pled guilty "has no non-jurisdictional ground upon which to attack that judgment except the inadequacy of the plea," *Bundy*, 392 F.3d at 644-45, or the government's "power to bring any indictment at all," *Broce*, 488 U.S. at 575; *see United States v. Bluso*, 519 F.2d 473, 474 (4th Cir. 1975) ("A guilty plea is normally understood as a lid on the box, whatever is in it, not a platform from which to explore further possibilities."); *see also Blackledge v. Perry*, 417 U.S. 21, 29-30 (1974) ("[W]hen a criminal defendant enters a guilty plea, he

may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. Rather, a person complaining of such antecedent constitutional violations is limited . . . to attacks on the voluntary and intelligent nature of the guilty plea, through proof that the advice received from counsel was not within the range of competence demanded of attorneys in criminal cases." (internal quotation marks and citations omitted)).

Relying on *United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000), Moussaoui maintains that his alleged constitutional violations rendered his guilty plea involuntary. In *Hernandez*, the Ninth Circuit held that a district court's error in denying the defendant's request to represent himself rendered the defendant's subsequent guilty plea involuntary. *See id.* at 626-27. In so doing, the court noted that the error at issue was structural, meaning that it "undermine[d] the integrity of the trial mechanism itself."[11] *Id.* at 626. Thus, the court reasoned that the refusal by the district court to allow the defendant to represent himself left the defendant only with a choice "between pleading guilty and submitting to a trial the very structure of which would be unconstitutional." *Id.* at 626 (emphasis omitted). Moussaoui argues that his guilty plea is invalid for the same reason.

With all due respect, we are not persuaded by the analysis in *Hernandez*. As noted above, a guilty plea is constitutionally valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31. The *Hernandez* court's conclusion that the defendant's guilty plea was involuntary was based on a faulty premise, namely, that his only alternative was to submit to an unconstitutional trial. This premise fails to account for the fact that if the defendant proceeded to trial and was convicted, he could seek an appellate remedy for the constitu-

---

[11]An error that qualifies as "structural" is not subject to harmless-error analysis. *See Neder v. United States*, 527 U.S. 1, 7 (1999).

tional violations he alleged. *See Bundy*, 392 F.3d at 645 ("[A] defendant might rationally choose to proceed to trial for the sole purpose of preserving a pretrial issue for appellate review."). Had Moussaoui been convicted after a trial, he, too, could have sought to vindicate his claims on appeal. Thus, the rulings Moussaoui now challenges, even if erroneous, did not render his guilty plea involuntary.[12]

In sum, Moussaoui, having pled guilty, has waived all non-jurisdictional errors leading up to his conviction except those affecting the adequacy of his plea. It is to those claims, affecting the adequacy of his plea, that we now turn.

## B.  *The "Unknowing and Uncounselled" Challenge*

Moussaoui's challenge to the adequacy of his plea arises out of the district court's handling of the classified discovery and the effect this had upon his guilty plea. Specifically,

---

[12]Moussaoui incorrectly maintains that the Supreme Court in *United States v. Dominguez Benitez*, 542 U.S. 74 (2004), suggested that a guilty plea is invalidated by a prior error if it is structural. *Dominguez Benitez* described the showing that defendants must make to satisfy the substantial-rights prong on plain-error review of alleged Rule 11 violations. Although the Court suggested the prong would be satisfied if Rule 11 violations were structural, *see id.* at 81, Rule 11 violations clearly relate to the adequacy of a guilty plea, *see United States v. Wood*, 378 F.3d 342, 349 (4th Cir. 2004) (explaining that the district court's plea colloquy with a defendant is the proceeding that conclusively "establish[es] that the defendant knowingly and voluntarily enters his plea"). *Dominguez Benitez* did not suggest that an error not concerning a guilty plea's adequacy could invalidate the plea simply because the error was structural.

In fact, the notion that a structural error occurring prior to a guilty plea invalidates the subsequent guilty plea would be at odds with the result in *Tollett v. Henderson*, 411 U.S. 258 (1973), wherein the defendant sought to invalidate his guilty plea on the basis that blacks were systematically excluded from the grand jury that indicted him. Although the Supreme Court has subsequently clarified that such exclusion would amount to structural error, *see Vasquez v. Hillery*, 474 U.S. 254, 262-64 (1986), the *Tollett* Court held that the defendant's claim, even if true, would not invalidate his guilty plea. *See Tollett*, 411 U.S. at 266-68.

Moussaoui asserts that the district court violated CIPA,[13] and that these violations resulted in a guilty plea that was neither knowing nor properly counseled. The guilty plea was not knowingly entered, Moussaoui argues, because the district court and the Government denied him personal access to material and exculpatory evidence during the discovery process, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The guilty plea was not properly counseled, he argues, because defense counsel, to whom the information had been provided, were not allowed to discuss the substance of it with him prior to his pleading guilty, in violation of *Geders v. United States*, 425 U.S. 80 (1976).[14]

## 1.  *The CIPA Process*

### a.

Under Rule 16 of the Federal Rules of Criminal Procedure, the Government must produce, among other things, items "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). However, "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief," and "may permit a party to show good cause by a written statement that the court will inspect *ex parte*." Fed. R. Crim. P. 16(d). "'[G]ood cause' includes the protection of information vital to the national security." *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008) (internal quotation marks omitted).

---

[13]In particular, Moussaoui asserts that the district court erred in allowing the Government to produce classified, documentary discovery to his defense counsel in lieu of to him personally, and erred in allowing the Government to produce classified summaries of highly classified reports at issue in the prior appeal. He also asserts that the district court erred in restricting communications with his counsel under the Protective Order.

[14]As noted earlier, Moussaoui's constitutional claims under *Brady* and *Geders*, as well as his claims that CIPA was violated, are barred by his guilty plea. *See Tollett*, 411 U.S. at 267. Unlike the other pre-plea claims, however, these claims also form the basis for his challenge to the adequacy of the plea itself, which is cognizable on appeal.

"Originally enacted by Congress in an effort to combat the growing problem of graymail, a practice whereby a criminal defendant threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the charge against him," *United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008), CIPA provides procedures for protecting classified information without running afoul of a defendant's right to a fair trial.[15] Section 4 of CIPA governs discovery of classified information by a defendant, and is the most pertinent provision in Moussaoui's challenge. It provides that:

> [t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone.

---

[15]Classified information includes "any information or material that has been determined by the United States Government . . . to require protection against unauthorized disclosure for reasons of national security." 18 U.S.C.A. app. 3, § 1. "Upon motion of the United States, the court *shall* issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case." 18 U.S.C.A. app. 3, § 3 (emphasis added). The Government's right to protect such information is absolute, and we do not second guess such determinations. *See Abu Ali*, 528 F.3d at 253 ("'[W]e have no authority[ ] to consider judgments made by the Attorney General concerning the extent to which the information . . . implicates national security. Similarly, neither the prosecutorial decisions . . . nor the possibility of graymail . . . comes within our purview.'" (quoting *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990)).

18 U.S.C.A. app. 3, § 4; *see In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 121 (2d Cir. 2008) (CIPA § 4's "provisions on discovery . . . complement those of Rule 16(d)" by "giv[ing] trial judges adequate guidance to protect against the unauthorized disclosure of classified information in the custody of the federal courts." (internal quotation marks omitted)). Section 4 "allows the district court to authorize the government to redact information from classified documents *before* providing such documents to the defendant during pretrial discovery." *United States v. Moussaoui*, 333 F.3d 509, 514 n.6 (4th Cir. 2003) ("*Moussaoui I*) (emphasis added); *see also Aref*, 533 F.3d at 78 (CIPA § 4 "clarifies [the] district courts' power under [Rule] 16(d)(1) to issue protective orders denying or restricting discovery for good cause."); *United States v. Smith*, 780 F.2d 1102, 1105 n.7 (4th Cir. 1985) (en banc) (noting that CIPA § 4 "provides a procedure by which the court can delete portions of classified documents to be discovered by a defendant. Substitutions are also permitted under certain circumstances.").

Sections 5 and 6 of CIPA "establish[ ] a pretrial procedure for ruling upon the admissibility of classified information." *Smith*, 780 F.2d at 1105. The defendant must notify the government and the court of classified information he expects to use, and the defendant is prohibited from "disclos[ing] any information known or believed to be classified . . . until the United States has been afforded a reasonable opportunity to seek a determination pursuant to the procedure set forth in section 6 of [CIPA]." 18 U.S.C.A. app. 3, § 5. "Once the defendant gives notice of his intention to introduce classified information, the United States may request a [section 6] hearing at which the court shall determine the 'use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding.'" *Smith*, 780 F.2d at 1105 (quoting 18 U.S.C.A. app. 3, § 6(a)).[16] If the

---

[16]This hearing must be conducted *in camera* if the government certifies "that a public proceeding may result in the disclosure of classified infor-

court authorizes "the disclosure of specific classified information under the procedures established by [section 6], the United States may move that, in lieu of the disclosure of such specific classified information," the court approve the use of a substitution in the form of "a statement admitting relevant facts that the specific classified information would tend to prove," or "a summary of the specific classified information." 18 U.S.C.A. app. 3, § 6(c)(1); *see also Smith*, 780 F.2d at 1105. "The court *shall* grant such a motion of the United States if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.A. app. 3, § 6(c)(1) (emphasis added).[17]

b.

The parties in this case were aware from the outset that voluminous classified information pertaining to al Qaeda and the 9/11 attacks would require special handling under CIPA.

In January 2002, the district court issued the Protective Order, pursuant to Rule 16(d)(1) and CIPA § 3. Under the Protective Order, classified information would be produced by the Government only to persons possessing the requisite security clearance, a category that included Moussaoui's appointed counsel but excluded Moussaoui. All other "per-

---

mation." 18 U.S.C.A. app. 3 § 6(a). The government must also "provide the defendant with notice of the classified information that is at issue." 18 U.S.C.A. app. 3, § 6(b)(1). If the classified information has been produced to the defendant, it must be specifically identified. If it has not been made available to the defendant, it "may be described by generic category, in such form as the court may approve." *Id.*

[17]Section 6(c) hearings must also be conducted *in camera* at the government's request, and the government may require that the court examine *in camera* and *ex parte* "an affidavit of the Attorney General certifying that disclosure of classified information would cause identifiable damage to the national security of the United States and explaining the basis for the classification of such information." 18 U.S.C.A. app. 3, § 6(c).

son[s] whose assistance the defense reasonably require[d] [could] only have access to classified information . . . after obtaining from the Court—with prior notice to the government—an approval for access to the appropriate level of classification on a need to know basis." J.A. 97-98. Defense counsel were also prohibited from "disclos[ing] such information or documents to [Moussaoui] without prior concurrence of counsel for the government, or, absent such concurrence, prior approval of the Court." J.A. 104.

The parties agree that the effect of the Protective Order was that Moussaoui's defense counsel would have access to classified information produced under CIPA § 4, but could not show or discuss the contents of the material with Moussaoui who, as an admitted al Qaeda terrorist already detained on immigration violations, would not be granted the necessary clearance. The Protective Order, however, did not preclude Moussaoui from *ever* having access to material or exculpatory evidence. On the contrary, Moussaoui would be given personal access to classified information "if such access should be determined by the Court to be necessary." J.A. 101.

The parties agreed upon a schedule for handling the classified information issues, providing deadlines for the filing of section 5 designations by the defense and section 6 requests by the Government. The final section 6 hearing to resolve all remaining classified issues was to be completed several weeks prior to trial.

In June 2002, Moussaoui's motion to proceed *pro se* was granted, complicating the manner in which the district court and counsel had intended to handle the classified information produced in discovery. Because of the complexity of the case, the district court opted to exercise its discretion to appoint standby counsel to assist the court and Moussaoui with these matters. *See McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984); *United States v. Gallop*, 838 F.2d 105, 110 (4th Cir. 1988). In September 2002, the handling of classified informa-

tion was further complicated when Moussaoui began seeking access to the ECWs. Faced with an issue of first impression, the court issued a new set of discovery orders protecting certain classified information pertaining to these witnesses pending decisions on the issue of whether Moussaoui would be granted access to the witnesses for Rule 15 depositions or whether suitable substitutions could be prepared under CIPA § 6(c).

After an interlocutory appeal from the district court's order granting access to the ECWs, we initially remanded the matter to allow the Government to propose CIPA § 6(c) substitutions for the ECWs testimony and directed the district court to determine whether the proposed substitutions "'w[ould] provide the defendant with substantially the same ability to make his defense as would' the disclosure ordered by the district court." *United States v. Moussaoui*, No. 03-4162, 2003 WL 1889018 (4th Cir. Apr. 14, 2008) (unpublished order) (quoting CIPA § 6(c)(1)).

The Government's proposed CIPA § 6(c) substitutions for the testimony of the ECWs were thereafter taken from answers to questions recorded in "highly classified reports . . . intended for use in the military and intelligence communities" and not "with this litigation in mind." *Moussaoui II*, 382 F.3d at 458 n.5. "Portions of the[se] reports concerning Moussaoui and the September 11 attacks [were] excerpted and set forth in documents prepared for purposes of this litigation." *Id.* These documents were "deemed summaries by the parties and the district court." *Id.* (internal quotation marks and alterations omitted). The summaries were then "provided to defense counsel in conformance with the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The proposed substitutions [were] based on the . . . summaries." *Id.* (internal quotation marks and alterations omitted). The Government presented these highly classified reports, along with the summaries for comparison, to the district court *ex*

*parte*. The summaries themselves remained classified pending the appeal process but were produced to defense counsel.

Upon its *ex parte* review, the district court was impressed with the accuracy of the classified summaries, *see id.* at 478 n.30, but felt that the classified reports that led to the proposed substitutions were unreliable and that the substitutions were also flawed, *see id.* at 459. Thus, the district court ordered the Government to produce the witnesses for Rule 15 depositions. When the Government refused to produce the witnesses, the district court ruled that "Moussaoui had adequately demonstrated that the witnesses could provide testimony that, if believed, might preclude a jury from finding Moussaoui eligible for the death penalty" and dismissed the death notice. *Id.* at 459. "[B]ecause proof of Moussaoui's involvement in the September 11 attacks was not necessary to a conviction, and because the witnesses' testimony, if believed, could exonerate Moussaoui of involvement in those attacks," the district court also ruled the Government would be prohibited "from making any argument, or offering any evidence, suggesting that [Moussaoui] had any involvement in, or knowledge of, the September 11 attacks." *Id.* at 459-60 (internal quotation marks omitted).

On September 13, 2004, we issued our decision affirming the district court's conclusion "that the [ECWs] could provide material, favorable testimony on Moussaoui's behalf." *Moussaoui II*, 382 F.3d at 456. With regard to the substitutions, we agreed that they were inadequate but rejected the district court's implicit conclusion that no adequate substitutions could be crafted because the classified summaries were inherently inadequate. *See id.* at 478. In particular, we noted the Government's "profound interest in obtaining accurate information from the witnesses and in reporting that information accurately to those who can use it to prevent acts of terrorism and to capture other al Qaeda operatives, . . . considerations [that] provide[d] sufficient indicia of reliability to alleviate the concerns of the district court." *Id.* We found that the clas-

sified summaries did "provide an adequate basis for the creation of" substitutions, *id.* at 479, and "remand[ed] with instructions for the district court and the parties to craft substitutions under certain guidelines." *Id.* at 457.

Accordingly, when we remanded to the district court in the previous appeal, the CIPA process was well underway, but incomplete. The classified, exculpatory information had been produced by the Government to defense counsel pursuant to the terms of the Protective Order. In accordance with our holding that Moussaoui was entitled to such evidence in a suitably unclassified form for use at trial, the district court was poised to finalize this process, with the input and assistance of counsel for both parties and Moussaoui, when Moussaoui notified the district court of his desire to enter an unconditional plea of guilty to all counts.

## 2.   *The Brady Claim*

Moussaoui first complains that the Protective Order issued under CIPA allowed the Government to deprive him of exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, Moussaoui asserts that he was deprived of personal access to the statements of multiple individuals which could have demonstrated that he was not slated to participate in the 9/11 attacks and that he was slated to participate, if at all, in the second wave of attacks, which never occurred. Moussaoui contends that this evidence was exculpatory because it could have demonstrated that he was not involved in the 9/11 terrorist attacks at all.

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a true *Brady* claim, however, it is not enough simply to say that favorable evidence was withheld. The accused

must prove (1) that the "evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) that the "evidence [was] suppressed by the [government], either willfully or inadvertently"; and (3) that the evidence was material to the defense, *i.e.*, "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (including impeachment evidence within the scope of materials that *Brady* requires prosecutors to disclose).

The *Brady* right, however, is a *trial* right. It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment, and exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty. *See Brady*, 373 U.S. at 87; *United States v. Ruiz*, 536 U.S. 622, 628 (2002) (noting that *Brady* rights are provided as part of the Constitution's "'fair trial' guarantee"); *id.* at 634 ("The principle supporting *Brady* was 'avoidance of an unfair trial to the accused.'") (Thomas, J., concurring) (quoting *Brady*, 373 U.S. at 87).

When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted. *See Menna v. New York*, 423 U.S. 61, 62 n.2 (1975) (per curiam) (explaining that a defendant's admission of guilt in a guilty plea is "so reliable that, *where voluntary and intelligent*, it *quite validly* removes the issue of factual guilt from the case") (first emphasis added); *Matthew v. Johnson*, 201 F.3d 353, 361 (5th Cir. 2000) (explaining that "[t]he *Brady* rule's focus on protecting the integrity of trials suggests that where no trial is to occur, there may be no constitutional violation"); *Orman v. Cain*, 228 F.3d 616, 617 (5th Cir. 2000) ("*Brady* requires a prosecutor to disclose exculpatory evidence for purposes of ensuring a fair trial, a concern that is absent when a defendant waives trial and pleads guilty.").

In *Ruiz*, the Supreme Court considered whether a guilty plea is invalidated by a prosecutor's failure to provide excul-

patory *impeachment* information to a defendant prior to the plea. *See* 536 U.S. at 625. In holding that it is not, the Court recognized that due process considerations do not require prosecutors to disclose all information that might be of use to a defendant in deciding whether to plead guilty. *See id.* at 629-30. The Court noted that it had permitted courts to accept guilty pleas where the defendant lacked knowledge of many different circumstances, including the strength of the government's case. *See id.* at 630-31. The Court also reasoned that the value to the defendant of requiring disclosure of impeachment evidence was relatively low compared to the substantial interference that such a requirement could cause to ongoing criminal investigations and the protection of government witnesses. *See id.* at 631-32.

To date, the Supreme Court has not addressed the question of whether the *Brady* right to *exculpatory* information, in contrast to *impeachment* information, might be extended to the guilty plea context. *Compare United States v. Conroy*, 567 F.3d 174, 179 (5th Cir. 2009) (per curiam) (rejecting claim that the Supreme Court's rejection of a *Brady* challenge in *Ruiz* based upon "impeachment evidence implie[d] that exculpatory evidence is different and must be turned over before entry of a plea"), *with McCann v. Mangialardi*, 337 F.3d 782, 787-88 (7th Cir. 2003) (stating that "[t]he Supreme Court's decision in *Ruiz* strongly suggests that a *Brady*-type disclosure might be required" in circumstances where the prosecution "ha[s] knowledge of a criminal defendant's factual innocence but fail[s] to disclose such information to a defendant before he enters into a guilty plea."); *Matthew*, 201 F.3d at 364 (considering question of whether a pre-plea nondisclosure of exculpatory evidence might render a plea invalid under the Due Process Clause irrespective of *Brady*). In *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002), however, we held that *Ruiz* foreclosed any claim by the defendant that the prosecutor's failure to disclose information potentially relevant as mitigation evidence in the death-penalty phase of defendant's trial served to invalidate his guilty plea.

Whether our decision in *Jones* is sufficient to dispose of the claim before us here is a close one. We need not resolve it, however, because even if we were to assume that the prosecution's failure to disclose material exculpatory evidence at the plea stage could result in an unknowing plea in certain narrow circumstances, Moussaoui cannot demonstrate that *his* guilty plea was entered unknowingly for this reason.

The inquiry in any challenge to a guilty plea is whether the plea was entered voluntarily, and whether the related "waiver of [the defendant's] right to receive from prosecutors exculpatory . . . material" was made "'knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences.'" *Ruiz*, 536 U.S. at 628-29 (quoting *Brady*, 397 U.S. at 748) (alterations in original). In short, Moussaoui fails to demonstrate that *his* waiver of the purported right to exculpatory evidence prior to pleading guilty was not made knowingly and intelligently, with sufficient awareness of the relevant circumstances and likely consequences.

First, with regard to the documentary classified information, Moussaoui when he first attempted to plead guilty in 2002 was advised that there was "exculpatory evidence which ha[d] not been provided to him and that his plea of guilty may mean that he might never have the benefit of such information to use to contest his guilt." J.A. 866. A month later, the district court denied Moussaoui's *pro se* motion for access to classified evidence, advising him that the process of reviewing the classified discovery was ongoing, that the United States had declassified and was continuing to declassify documents, and that "[p]resumably, [he] has had or will have access to the declassified discovery so long as it is not subject to a separate protective order." J.A. 1126.

Second, with regard to the classified information pertaining to the ECWs, Moussaoui had personally sought access to the ECWs *because* he believed they might possess helpful information. From then until remand from our decision in *Moussaoui II*, the district court and this court *confirmed* his belief, making it clear that the ECWs could indeed offer material, exculpatory evidence on his behalf, but ruling that Moussaoui's constitutional right to this evidence could be met with appropriate substitutions under CIPA § 6(c). In doing so, we even went so far as to explain *why* the ECW statements were exculpatory and we remanded for the preparation of substitutions with Moussaoui's assistance and input. *See Moussaoui II*, 382 F.3d at 456 (affirming the district court's conclusion "that the [ECWs] could provide material, favorable testimony on Moussaoui's behalf"); *id.* at 473 (noting, among other things, that the witness statements "tend[ed] to exculpate Moussaoui [as they] undermine[d] the theory . . . that Moussaoui was to pilot a fifth plane into the White House" and were "consistent with Moussaoui's claim that he was to be part of a post-September 11 operation"); *id.* at 474 (noting that the statements indicated that "Moussaoui's operational knowledge was limited, a fact that is clearly of exculpatory value as to both guilt and penalty" and "support[ed] Moussaoui's contention that he was not involved in the September 11 attacks").

Thus, unlike in the traditional *Brady* context, or even those cases relied upon by Moussaoui for a *Brady*-type pre-plea right to exculpatory evidence, the Government did not suppress favorable evidence from the defense, much less evidence of factual innocence. On the contrary, the Government *produced* the evidence, in accordance with the Protective Order, to defense counsel pending the final CIPA § 6(a) and § 6(c) determinations on remand and Moussaoui was aware that this evidence had been so produced. *See Moussaoui II*, 382 F.3d at 458 n.5, 462 n.14 (noting that the classified summaries had "been provided to defense counsel in conformance with the Government's obligations under *Brady*" and that

there was "no evidence before us that the Government pos-
sess[ed] exculpatory material that ha[d] not been disclosed to
the defense"). When the Supreme Court denied review of our
opinion and the case was returned to the district court, Mous-
saoui was well aware that there was classified, exculpatory
evidence yet to be produced to him personally *and* he knew
why the material was exculpatory. Rather than wait for the
process to be completed, Moussaoui made the strategic deci-
sion to plead guilty immediately. He even went so far as to
confirm with the district court that, because the substitutions
for the ECWs testimony had not yet been completed, he
would retain the right to challenge the final substitutions on
appeal *if* he received the death penalty.

"[T]he law ordinarily considers a waiver knowing, intelli-
gent, and sufficiently aware if the defendant fully understands
the nature of the right and how it would likely apply *in gen-
eral* in the circumstances—even though the defendant may
not know the *specific detailed* consequences of invoking it."
*Ruiz*, 536 U.S. at 629. Under the circumstances, we have no
trouble concluding that Moussaoui entered his guilty plea
knowingly, and with sufficient awareness of the relevant cir-
cumstances and likely consequences of his decision, and that
the district court did not err in accepting his plea prior to com-
pletion of the CIPA process. Clearly, the plea "represent[ed]
a voluntary and intelligent choice among the alternative
courses of action open to [him]." *Alford*, 400 U.S. at 31.[18]

---

[18]Finally, we note that the CIPA process actually continued after the
guilty plea in preparation for the sentencing proceeding, and the exculpa-
tory, classified information was made available for Moussaoui's use in an
appropriate form. Moussaoui thereafter testified, confirmed his guilt to the
offenses as charged, and *contradicted* the supposed exculpatory statements
of the ECWs as they related to his intended participation in the 9/11
strikes. The *Brady* material that Moussaoui claims he was entitled to pre-
plea was either produced post-plea or was cumulative to evidence that was
produced. Yet, Moussaoui did not seek to withdraw his guilty plea until
*after* he had successfully defended against the sentence of death. Evidence
is material, and prejudice ensues for purposes of *Brady*, "only if there is

### 3.  *The "Advice of Counsel" Claim*

For similar reasons, we also reject Moussaoui's claim that the district court constructively denied him his right to counsel by restricting defense counsel's ability to discuss the classified exculpatory evidence with him prior to his acceptance of the guilty plea, rendering his plea invalid.

"Since *Gideon v. Wainwright*, 372 U.S. 335 (1963), it has been clear that a guilty plea to a felony charge entered without counsel and without a waiver of counsel is invalid." *Brady*, 397 U.S. at 748 n.6; *see Broce*, 488 U.S. at 569 ("[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary."); *see McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("[A] defendant pleading guilty to a felony charge has a federal right to the assistance of counsel."). The waiver of constitutional rights accompanying a guilty plea has to be a "knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences," *Brady*, 397 U.S. at 748, and "an intelligent assessment of the relative advantages of pleading guilty is frequently impossible without the assistance of an attorney," *id.* at 748 n.6.

Where a defendant alleges ineffective assistance of counsel, he must ordinarily "demonstrate that counsel performed deficiently and that, but for counsel's errors, the defendant would not have pled guilty and would instead have insisted on proceeding to trial." *United States v. Faris*, 388 F.3d 452, 459

a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Because Moussaoui has also failed to demonstrate a reasonable probability that disclosure of the classified information would have altered his decision to plead guilty, his *Brady* claim would also fail on the merits.

(4th Cir. 2004). "This standard derives from the test for ineffective assistance of counsel set forth in *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985), which relied in turn on the standards announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984)." *Id.* at 459 n.4.

However, "[i]n unusual circumstances, a defendant may obtain reversal of his conviction based on the inadequacy of counsel even in the absence of a showing that would satisfy *Hill* or *Strickland*." *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 659-60 (1984)). Such a constructive denial of counsel results from circumstances where "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided" at all. *Cronic*, 466 U.S. at 654 n.11; *see Lenz v. Washington*, 444 F.3d 295, 303-04 (4th Cir. 2006) (stating that a constructive denial of counsel "arises only when a lawyer entirely fails to subject the prosecution's case to meaningful adversarial testing, and thus might as well be absent from the proceedings") (internal quotation marks and citations omitted); *Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir. 1997) (applying *Cronic* to the guilty plea context).[19]

Moussaoui contends that the Protective Order constructively denied him counsel under *Cronic* because it prohibited counsel from discussing the substance of the exculpatory evidence with him prior to his guilty plea. *See Geders*, 425 U.S. at 91 (holding that trial court's order barring defendant from consulting with defense counsel during an overnight recess deprived defendant of his Sixth Amendment right to counsel).

---

[19]Moussaoui does not argue that counsel's performance was deficient or that he was prejudiced by it. There was no requirement that the Government produce the classified, exculpatory evidence to defense counsel in the pretrial process under CIPA § 4 in the first instance. In addition, Moussaoui had categorically rejected all defense counsel as his enemy and made it clear that he was uninterested in communicating with his counsel or following their advice.

To the extent we would adopt some *Cronic*-like standard for guilty pleas, however, Moussaoui falls well short of demonstrating that his guilty plea was entered under circumstances amounting to "no assistance of counsel" at all. *Cronic*, 466 U.S. at 654 n.11. In fact, Moussaoui cannot even demonstrate that his plea was uncounselled on the matter of exculpatory evidence.

First, the restrictions on counsel's ability to communicate with Moussaoui regarding pretrial discovery matters were not so onerous as to render counsel effectively absent during the guilty plea proceeding. The right to communicate with counsel at any point in the proceedings is not absolute. "[I]n certain contexts there can be an important need to protect a countervailing interest, which may justify a restriction on defendant's ability to consult with his attorney if the restriction is carefully tailored and limited." *In re Terrorist Bombings*, 552 F.3d at 127 (internal quotation marks omitted); *see United States v. Hung*, 667 F.2d 1105, 1107-08 (4th Cir. 1981) (per curiam) (holding that protective order prohibiting defense counsel from disclosing contents of certain documents did not violate defendant's Fifth or Sixth Amendment rights where trial court allowed defense counsel to review Jencks Act material to assist in determining whether material should be disclosed, but precluded counsel from consulting with defendant about the material); *United States v. Bell*, 464 F.2d 667, 671-72 (2d Cir. 1972) (counsel barred from disclosing sensitive airport hijacker profiling system); *cf. Morgan v. Bennett*, 204 F.3d 360, 368 (2d Cir. 2000) (barring counsel from disclosing identity of a cooperating witness to the defendant); *United States v. Herrero*, 893 F.2d 1512, 1526-27 (7th Cir. 1990) (barring counsel from revealing name of a confidential informant to the defendant).

That principle applies in this case. The Government's interest in protecting the classified information during the discovery and appeal process justified the limited restrictions upon Moussaoui's right to communicate with counsel pending

completion of the CIPA process and preparation of unclassi-
fied substitutions. *Cf. Abu Ali*, 528 F.3d at 254 ("A defendant
and his counsel, if lacking in the requisite security clearance,
*must* be excluded from hearings that determine what classified
information is material and whether substitutions crafted by
the government suffice to provide the defendant adequate
means of presenting a defense and obtaining a fair trial.")
(emphasis added).

Second, Moussaoui has failed to demonstrate that he was
completely denied counsel's advice regarding the evidence at
issue, or that counsel's advice was so lacking that it amounted
to none at all. As discussed previously, Moussaoui knew that
the exculpatory information existed and had been produced to
his counsel, knew the substance of the information, and knew
that the process for evaluating and declassifying that informa-
tion was ongoing. He was also well aware that the process
would be completed upon our remand to the district court
from the previous appeal. In any event, the Protective Order
did not preclude defense counsel from advising Moussaoui
that the evidence existed, as they did prior to the July 2002
guilty plea attempt, or from providing advice on how the clas-
sification review process would be completed. In fact, it
appears from the record that Yamamoto and Moussaoui did
discuss the issue, but Moussaoui disagreed with counsel about
the effect of his plea upon the substitution process and Mous-
saoui made the informed and strategic decision to plead guilty
*before* the process was completed. For its part, the district
court employed a cautious manner of dealing with Mous-
saoui's guilty plea. At the *ex parte* plea proceeding, the court
ensured that Moussaoui had received the advice of his counsel
on these matters. Moussaoui made it clear at this hearing and
the public Rule 11 hearing that he had met with his attorneys,
who had advised that he *not* plead guilty, but that he was
freely and voluntarily choosing to reject that advice.

While a guilty plea must be counseled in the sense that the
defendant has a right to effective assistance of counsel in

making the decision, in the end it is the "defendant [who] has 'the ultimate authority' to determine 'whether to plead guilty.'" *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)); *see also Miller v. Angliker*, 848 F.2d 1312, 1322 (2d Cir. 1988) ("[T]he right to decide whether to plead guilty . . . belongs to the defendant, not to counsel."); *cf. Roe v. Flores-Ortega*, 528 U.S. 470, 485 (2000) ("Like the decision whether to appeal, the decision whether to plead guilty (*i.e.*, waive trial) rested with the defendant."). It is counsel's duty to ensure that the defendant is sufficiently aware of the facts and circumstances surrounding the plea so that the defendant can make a reasonably informed decision. Here, Moussaoui has failed to demonstrate the type of complete denial of counsel rising to the level of a constructive denial of counsel under the Sixth Amendment. On the contrary, it appears that counsel was determined to effectively represent Moussaoui, and did so, in spite of Moussaoui's uncooperative behavior and indeed belligerence towards them.

## III.   *Failure to Hold Competency Hearing*

Moussaoui's next claim is that the district court erred when concluding that his plea was knowing and voluntary because the court failed to hold a competency hearing before accepting his plea.

"Before a court may accept a guilty plea, it must ensure that the defendant is competent to enter the plea." *United States v. Damon*, 191 F.3d 561, 564 (4th Cir. 1999). The standard for competence to plead guilty is the same as that for competence to stand trial: whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *Godinez v. Moran*, 509 U.S. 389, 402 (1993) (applying standard to guilty plea context).

The district court should hold a competency hearing when it has reasonable cause to believe that a defendant may suffer from a mental disease or defect that interferes with his ability to understand the nature and consequences of entering a plea of guilty. *See* 18 U.S.C.A. § 4241(a) (West Supp. 2008). "To prevail, the defendant must establish that the trial court ignored facts raising a bona fide doubt regarding [his] competency to stand trial." *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003) (internal quotation marks omitted). The district court should examine "all of the record evidence pertaining to the defendant's competence, including: (1) any history of irrational behavior; (2) the defendant's demeanor at and prior to sentencing; and (3) prior medical opinions on competency." *United States v. General*, 278 F.3d 389, 397 (4th Cir. 2002). However, "there are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Walton*, 321 F.2d at 459 (internal quotations omitted). A district court's decisions on competency, as well as its denial of requests for further competency evaluations, are reviewed for an abuse of discretion. *See United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995).

Moussaoui's counsel first requested a competency evaluation in April 2002, in connection with Moussaoui's request to proceed *pro se*. Counsel acknowledged that they had not planned to ask for an evaluation for purposes of the defense but felt it was warranted for purposes of the request to proceed *pro se*. The district court observed that Moussaoui was "obviously a very smart" man, J.A. 262, and "appear[ed] to know and understand what [he was] doing," J.A. 263. However, the district court agreed to order an evaluation "out of an abundance of caution" and held Moussaoui's motion to proceed *pro se* in abeyance pending the results. J.A. 514.

Dr. Raymond Patterson was appointed to perform the competency evaluation. When Moussaoui refused to cooperate, the district court advised Moussaoui that his refusal was

"merely frustrating his own goal of representing himself" and that "his meeting with Dr. Patterson [was] necessary before any decision [could] be made on his pending motion." 2 Supp. J.A. 11. Moussaoui was also advised that "[i]f [he] continue[d] to refuse to meet with Dr. Patterson, he may be sent to the Federal Correctional Center at Butner, North Carolina, the federal facility specializing in forensic psychiatric evaluations," for evaluation. 2 Supp. J.A. 11. Moussaoui thereafter agreed to an interview with Dr. Patterson.

Dr. Patterson concluded that "there [did] not appear to be a history or current symptoms consistent with a mental disease or defect that would interfere with [Moussaoui's] voluntary, intelligent, and knowing appreciation of the potential consequences of waiving counsel." J.A. 5758. Defense counsel retained two mental health experts, neither of whom met with or personally interacted with Moussaoui, who presented contrary opinions based upon reports of a family history of mental illness, a report that Moussaoui had been deemed ineligible for military service in France because of psychiatric issues noted during his medical examination, Moussaoui's *pro se* filings, and Moussaoui's solitary confinement. The defense experts also critiqued Dr. Patterson's conclusions and opined that further evaluation was needed.

On June 13, 2002, the district court reviewed the mental health reports and denied defense counsel's request for further evaluations of Moussaoui, noting the following:

> [I]t was out of an abundance of caution that I decided to have the mental evaluation performed of Mr. Moussaoui, because although his style, his writing style may be a bit more dramatic that would a lawyer's style be, . . . , Mr. Moussaoui does come from a different culture where things are done differently than we, and he is, in fact, in a much smaller section of that culture than even that culture itself as a whole. Cultural differences may appear irrational

> to different cultures. It doesn't mean the person is insane from a psychological standpoint. I think it's . . . very significant that the day-to-day observations of the people in the Alexandria Jail consistently negate any question about there being any serious mental illness or disease from Mr. Moussaoui.

J.A. 514. The district court also considered the potential impact of solitary confinement but noted that Moussaoui had been dressed appropriately with proper hygiene when observed by others and that the jailers had provided no evidence of decompensation caused by the restrictions. Additionally, the court noted, "I've certainly seen Mr. Moussaoui now two or three times in court and read all of his papers. And as I said, I don't see any basis to prolong this issue. I am comfortable in deciding the competency issue based upon the quantum of information that is before me." J.A. 516. Among other things, the court also noted that Moussaoui understood and complied when he was informed that he might be sent to Butner for a competency evaluation if he did not cooperate with Dr. Patterson. The court ruled that Moussaoui had "sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and rationally functioning understanding of the proceedings against him," and that he was competent to proceed *pro se* under the *Dusky* standard. J.A. 518.

On several occasions over the next four years, the district court addressed renewed challenges to Moussaoui's competency, each time in conjunction with proceedings in which the court personally observed and interacted with Moussaoui.

In July 2002, when Moussaoui first decided to plead guilty, defense counsel again raised the question of his competency to do so and submitted additional reports of the two defense experts, along with a third expert. Counsel also requested that the district court order access to Moussaoui for themselves and a mental health expert. The district court ruled that there

was no new evidence to support a claim that Moussaoui was not competent and that forcing Moussaoui to receive standby counsel and their mental health expert would deprive Moussaoui of the limited privacy to which he had insisted and further damage the relationship between Moussaoui and defense counsel. At the Rule 11 hearing, the district court ruled as follows:

> I have carefully considered the materials that were submitted by standby defense counsel as well as their doctor reports, but I am satisfied that Mr. Moussaoui is not presently suffering from a mental defect or disease of such a degree as to render him incompetent to represent himself or, assuming he answers the questions appropriately, to enter a knowing and voluntary plea of guilty to any one or all six of the charges. I am particularly impressed with the fact that although Mr. Moussaoui had filed numerous repetitive motions, at the hearing last week, when I advised him that he was not to file any more repetitive motions and if he did so, he might lose his *pro se* status, Mr. Moussaoui obviously understood the Court's admonition, because we have not received a single writing from him in a week, which is a record. But that indicates to the Court that Mr. Moussaoui is perfectly capable of understanding the Court's directions, and when he chooses to, he can follow those directions. That was similar to earlier in the case, when he was refusing to meet with Dr. Patterson, and I warned him in an order that continued refusal would result in the Court not being able to decide his *pro se* status. He thereafter met with Dr. Patterson. So although the defendant's pleadings are somewhat confrontational and somewhat unusual, they do not give the Court sufficient basis to make any kind of a finding that this man is not competent to go forward with a guilty plea if that is his desire, and there clearly is no basis in this record at this time to con-

> tinue or postpone these proceedings for a custodial,
> for a mental health forensic evaluation.

J.A. 993-94.

When Moussaoui pled guilty in April 2005, Moussaoui's counsel again challenged entry of the plea without further competency evaluations but did not ask for a full evaluation at Butner. The district court again rejected the challenge, reiterating that:

> despite the fact that we may disagree about things, this defendant has always struck this Court as articulate, intelligent, fully understanding the proceedings, and although his world view may be significantly different from ours and therefore at times perhaps difficult to understand, in my view, that does not . . . make a basis for arguing that he is incompetent.

2 Supp. J.A. 51. In addition, Yamamoto, the only defense counsel with whom Moussaoui would communicate, did not directly call into question Moussaoui's competency to plead guilty. Yamamoto stated that his "discussions with [Moussaoui had] been calm, rational. He knows what we're talking about. All that – those things are, are as the Court indicates. Whether or not there's some . . . mental health issues other than his ability to relate to me, I don't know." 2 Supp. J.A. 55. The district court also rejected the claim that Moussaoui's confinement had affected his ability to proceed, noting that "any human being locked up under the conditions in which he has been housed would naturally at times [get] frustrated and angry. That again does not equate to incompetence." 2 Supp. J.A. 51. The district court was satisfied that Moussaoui was competent to enter a guilty plea and scheduled the Rule 11 proceeding.

At the public Rule 11 proceeding, the district court noted its previous determination, adding that it was "fully satisfied

that Mr. Moussaoui is completely competent to enter his guilty pleas today. The defendant has acted against the advice of his counsel, but he has clearly exhibited both today and earlier this week a complete understanding of the ramifications of his guilty pleas." J.A. 1435; *see also* 2 Supp. J.A. 67 (noting that "[a] defendant in our system has an absolute right to reject [advice of counsel]" and "[i]t does not make him incompetent [or] unwise."). Yamamoto confirmed that Moussaoui, in discussing the plea, had "responded appropriately when I've spoken to him. He has had disagreements with me with respect to certain items. Those disagreements were appropriate disagreements." J.A. 1434.

Given this extensive record, we find no abuse of discretion in the district court's determination that Moussaoui was competent to proceed with his guilty plea and that further evaluations were unnecessary. The district court had the benefit of multiple reports of evaluating and consulting mental health specialists regarding Moussaoui's competency to proceed over the years and, at the time of the plea, Yamamoto confirmed that Moussaoui's interactions with him had been calm, rational, and appropriate. Most compelling, however, is that the district court had the unique benefit of extensive personal interactions with Moussaoui over the years leading up to his plea, most of which occurred while Moussaoui was representing and speaking for himself. In addition, the district court had the opportunity to observe Moussaoui represent himself at the Rule 15 deposition of a JI operative, during which Moussaoui conducted himself rationally and intelligently, conducted cross-examination of the witness, and made cogent objections, many of which were sustained by the district court. We also find significant the extensive discussion regarding Moussaoui's waiver of appellate rights, during which Moussaoui confirmed his understanding that a guilty plea precluded his raising constitutional arguments on appeal:

    What is certain, okay, is I've listened to their advice, read . . . the *Blackledge v. Perry* case [they

> sent] with the statement of the Supreme Court, who made absolutely clear that once you have pled guilty, you cannot raise any – you cannot raise claim relating to deprivation of constitutional rights . . . that occur prior to the entry of the guilty plea. This is the word of the Supreme Court.

2 Supp. J.A. 59.

Clearly, Moussaoui "ha[d] sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402 (internal quotation marks omitted). As noted by the district court, Moussaoui has a view that is significantly and culturally different from ours, but there is nothing to indicate that the district court's observations should have reasonably caused it to believe that Moussaoui was suffering from a mental disease or defect that interfered with his ability to understand the nature and consequences of entering a plea of guilty. *See Banks*, 482 F.3d at 743 (noting that "[w]e defer . . . to the district court because it is in a superior position to adjudge the presence of indicia of incompetency constituting reasonable cause to initiate a hearing"); *United States v. West*, 877 F.2d 281, 285 n.1 (4th Cir. 1989) (finding no abuse of discretion where "district court, having observed and talked with [defendant] at numerous prior hearings, found no reasonable cause to believe he was unfit to stand trial" and, thus, denied motion to determine mental competence).

## IV.    *Challenges to the Rule 11 Proceeding*

Moussaoui's final challenges to his guilty plea are based upon his assertion that the district court violated Rule 11 by (1) failing to inform him of the nature of the charged conspiracies, in particular, that they encompassed the 9/11 attacks; (2) failing to ensure that there was an adequate factual basis for his plea, including a basis for venue in the Eastern District

of Virginia; and (3) failing to inform him of the possible sentences he would face.

Rule 11 "governs the duty of the trial judge before accepting a guilty plea." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969). It requires the judge to address the defendant "to ensure that he understands the law of his crime in relation to the facts of his case, as well as his rights as a criminal defendant." *United States v. Vonn*, 535 U.S. 55, 62 (2002); *see also United States v. Wood*, 378 F.3d 342, 349 (4th Cir. 2004) (explaining that the plea colloquy is the avenue by which the court conclusively "establish[es] that the defendant knowingly and voluntarily enters his plea"); *United States v. Standiford*, 148 F.3d 864, 868 (7th Cir. 1998) ("The whole point of the Rule 11 colloquy is to establish that the plea was knowingly and voluntarily made."). We "accord deference to the trial court's decision as to how best to conduct the mandated colloquy with the defendant." *United States v. DeFusco*, 949 F.2d 114, 116 (4th Cir. 1991).

Because Moussaoui's claims are raised for the first time on appeal, our review is for plain error. *See Vonn*, 535 U.S. at 71. Moussaoui must therefore establish (1) error; (2) that was plain; and (3) that affected his substantial rights, *i.e.*, "a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominquez Benitez*, 542 U.S. 74, 83 (2004); *see United States v. Olano*, 507 U.S. 725, 731-32 (1993). Even then, the court will not "correct the forfeited error . . . unless [it] seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 731-32.

## A.  *Nature of the Charges*

Moussaoui claims that the district court failed to inform him of the nature of the charges and ensure that he understood them. *See* Fed. R. Crim. P. 11(b)(1)(G). Specifically, he contends that the Indictment charged him with participation in the

9/11 attacks, but he was led to believe that he was pleading guilty to a different conspiracy. We disagree.

As an initial premise, we reject Moussaoui's claim that the Indictment charged him only with conspiring to personally participate in the 9/11 attacks as a 9/11 hijacker. The Indictment charged Moussaoui with six conspiracy counts arising out of al Qaeda's plan to hijack airplanes and fly them into designated targets, and the Indictment identified 110 overt acts taken by the conspirators in furtherance of that plan. These overt acts included the actions taken by Moussaoui and the co-conspirators in preparation for such attacks and the 9/11 attacks themselves, which resulted in the deaths of nearly 3,000 people.[20] Based upon the deaths resulting from the 9/11 attacks, the Indictment also included special findings required under the FDPA to authorize the death penalty. Thus, the charged conspiracies were not agreements to carry out the 9/11 attacks specifically; the 9/11 attacks were overt acts taken after Moussaoui's arrest by his co-conspirators in furtherance of the charged conspiracies. They also served as the basis for the Government's decision to seek the death penalty.

During the plea colloquy, the district court properly informed Moussaoui of the nature of these charges and ensured that he understood them. The district court went over each count in the Indictment, which Moussaoui represented he had received long ago and "kn[ew] very much what [it was] talking about." J.A. 1419. *See Bousley v. United States*, 523 U.S. 614, 618 (1998) (noting that providing the defendant with a copy of the indictment "give[s] rise to a presumption that the defendant was informed of the nature of the charge against him"). In addition, Moussaoui was informed, among

---

[20]Counts One through Four and Six alleged that the conspiracies resulted in the deaths of thousands of persons on 9/11. Count Five alleged that the conspiracy involved the intent to kill officers and employees of the United States, including members of the Department of Defense stationed at the Pentagon.

other things, of the Government's burden of proof, including the requirement that it prove that Moussaoui "knowingly and intentionally entered into acts in furtherance of the conspirac-[ies], "knew about the conspirac[ies]," and "purposely joined [them]." J.A. 1425. Finally, the court correctly advised Moussaoui that the Government would "have to prove that *at least one* of the specific overt acts . . . listed in the [I]ndictment was committed either by [him] or by some other member of the conspirac[ies]." J.A. 1426.[21]

The court also addressed the Statement of Facts with Moussaoui. Moussaoui represented that he had read the Statement of Facts "more than ten times," had "pondered . . . each paragraph," and found the document to be factually accurate. J.A. 1431. He requested a single correction to paragraph 15, changing the date that he told his al Qaeda associate that he would finish jet simulator training from "by the 20th of August," 2001, to "before September 2001." 2 Supp. J.A. 45-46. The Statement of Facts laid out what the Government could prove at trial and was fully consistent with the charges in the Indictment, including a description of the 9/11 attacks as an object of the conspiracies and Moussaoui's admission that he lied to ensure the success of his co-conspirators. *See United States v. Lambey*, 974 F.2d 1389, 1395 (4th Cir. 1992) (en banc) ("Statements of fact by a defendant in a Rule 11 proceeding may not ordinarily be repudiated."); *Burket v. Angelone*, 208 F.3d 172, 191 (4th Cir. 2000) ("Absent clear and convincing evidence to the contrary, [a defendant] is bound by the representations he made during the plea colloquy."). At no point did Moussaoui deny that he was a part of the conspiracies, or deny that the conspiracies resulted in the 9/11 attacks.

---

[21]In addition, the district court had engaged in an extensive discussion of conspiracy law and its application to the charges at the Rule 11 hearing held in July 2002. *See Vonn*, 535 U.S. at 75 ("[T]here are circumstances in which defendants may be presumed to recall information provided to them prior to the plea proceeding.").

Notwithstanding these representations, Moussaoui now claims that the Statement of Facts and plea colloquy misled him into believing that he was not pleading guilty to any conspiracy that included 9/11, and that his confusion on this point was evidenced by various statements he made both pre-plea and post-plea. We are unpersuaded.

The elements of a conspiracy charge are: (1) an agreement among the defendants to do something which the law prohibits; (2) the defendants' knowing and willing participation in the agreement; and (3) an overt act by one of the conspirators in furtherance of the agreement's purpose. *See United States v. Hedgepath*, 418 F.3d 411, 420 (4th Cir. 2005). Because it is the agreement to commit the crime that creates the conspiracy, the defendant need not know the details of the underlying crime or "the entire breadth of the criminal enterprise." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). "A conspirator need not have had actual knowledge of the co-conspirators," and "a conspiracy conviction must be upheld even if the defendant played only a minor role in the conspiracy." *United States v. Morsley*, 64 F.3d 907, 919 (4th Cir. 1995); *see also United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."). The defendant "may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas v. United States*, 522 U.S. 52, 64 (1997).

In the Statement of Facts, Moussaoui admitted, among other things, that he "knew of al Qaeda's plan to fly airplanes into prominent buildings in the United States and he agreed to travel to the United States to participate in the plan." J.A. 1410. He admitted that "Bin Laden personally selected [him] to participate in the operation to fly planes into American buildings and approved Moussaoui attacking the White House." J.A. 1410. He also admitted that an al Qaeda asso-

ciate provided him with information about flight training, that he pursued such "training as a pilot in furtherance of al Qaeda's plan to use planes to kill Americans," and that he advised an al Qaeda associate that he would complete his training before September 2001. J.A. 1411.

Because Moussaoui had denied specific knowledge of the 9/11 hijackers, their activities, or the details of the planes operation in the United States, the Statement of Facts contained admissions placing him in the general conspiracies to hijack planes and use them to strike prominent buildings. It did not, however, involve admissions that Moussaoui knew the specifics of the operation, such as the precise date, the range of targets, and the identities of all the hijackers. The latter, however, were not necessary for his conviction, nor was his guilty plea contingent upon them—a fact that had been earlier recognized by the district court and this court in published opinions. *See United States v. Moussaoui*, 282 F. Supp. 2d 480, 484 (E.D. Va. 2003) (noting that "the United States correctly contends that it need not prove the defendant's participation in the September 11 attacks to obtain a conviction in this case."); *Moussaoui II*, 382 F.3d at 473 (noting argument "that even if the witnesses' testimony would tend to exonerate Moussaoui of involvement in the [9/11] attacks, such testimony would not be material because the conspiracies with which Moussaoui is charged are broader than [9/11]"). However, the Statement of Facts did include facts pertaining to the overt acts engaged in by his co-conspirators on 9/11, as well as an admission that Moussaoui "lied to federal agents to allow his al Qaeda 'brothers' to go forward with the operation." J.A. 1412. Thus, Moussaoui admitted facts sufficient to plead guilty to the conspiracy charges without foreclosing defense strategies during the death penalty phase that *would* directly focus upon Moussaoui's degree of culpability for the deaths that occurred on 9/11.

Moussaoui's pre-plea denials regarding his specific involvement in 9/11 also lend no support to his claim that he

was confused or misled about the nature of the conspiracy charges to which he was pleading guilty. Pre-plea denials of guilt, of course, would be the usual case where guilty pleas are entered after an arraignment. In addition, Moussaoui *never* admitted knowing the particulars of the planes operation. After he was asked to and agreed to become a participant in the planes conspiracy, he was sent here to train and await further instructions. While doing so, Moussaoui was kept separate from the other hijackers. But this was fully consistent with the operational trade craft of al Qaeda and Moussaoui's training as an al Qaeda soldier, *cf. United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000) (explaining that the fact that persons "were not always aware of the others' activities . . . would not prevent the jury from determining that a single conspiracy existed," as this was "part of the standard operating procedure for those engaged in espionage"), and does not indicate that Moussaoui was "confused" about the Indictment or at the guilty plea proceeding.

We also reject Moussaoui's claim that his post-plea statements demonstrate the failure of the district court to ensure his understanding of the nature of the charges and the confusion he labored under during the Rule 11 proceeding. After the district court accepted Moussaoui's guilty plea, the court turned to address motions and issues pertaining to the upcoming capital sentencing proceeding. In connection with the latter, Moussaoui advised the court that he wanted to "file [a] motion regarding ineffective assistance of defense counsel." J.A. 1438.[22] Part of his complaint was that defense counsel were pursuing a strategy that he was incompetent and had a

---

[22]As discussed in some detail above, Moussaoui vehemently opposed defense counsel's representation of him, both as counsel of record and as standby counsel, throughout the proceedings and refused to cooperate with the court, counsel, his mother, or Muslim counsel who had stepped forward to assist him. Although his hostile actions had resulted in the revocation of his right to proceed *pro se* by the time of the guilty plea proceeding, he continued to conduct himself as if he were *pro se*, and was given a great deal of latitude in this regard.

minor role in 9/11, instead of advancing his desire to argue, in mitigation, that he did not come "into the United States to participate in[ ] 9/11" at all. J.A. 1441. Clearly seeking to distance himself for purposes of the sentencing proceeding from the 9/11 attacks, and the deaths that served as the basis for a possible sentence of death under the FDPA, Moussaoui asserted a new theory of his role as an al Qaeda terrorist—that he "was being trained on the 747[-]400 to eventually use this plane *as stated in this [S]tatement of [F]act[s]* to strike the White House" but that his "aim" was to free Sheikh Omar Abdel Rahman," (a/k/a the "Blind Sheikh"), an al Qaeda associate who was being held in custody in Florence, Colorado, and that this "was a *different conspiracy* tha[n] 9/11." J.A. 1440 (emphasis added). In doing so, however, Moussaoui reiterated that he was "guilty of a broad conspiracy to use [a] weapon of mass destruction to hit the White House." J.A. 1440. He simply added that he was only to do so "if the American government refuse[d] to negotiate" to free the Blind Sheikh, and asserted that the 9/11 attacks were "not my conspiracy." J.A. 1440-41.

Although Moussaoui refers to his "Blind Sheikh" strategy as a "different conspiracy" from the so-called "9/11 conspiracy," we fail to see how his strategic post-plea claims could somehow render invalid the guilty plea he had just entered to the broader conspiracies. The district court had just reviewed the Indictment with Moussaoui, as well as the Statement of Facts that was sufficient to establish Moussaoui's participation in the al Qaeda conspiracies to hijack planes and fly them into buildings in the United States. At no point during the post-plea discussion did Moussaoui indicate that he was confused about the crimes to which he had just pled guilty. On the contrary, Moussaoui *reiterated* that he had pled guilty to the "broader conspiracy to use [an] airplane as [a] weapon of mass destruction" to hit the White House and that he was "being trained on the 747[-]400 to eventually use this plane as stated in this statement of fact to strike the White House." J.A. 1440. Far from exhibiting confusion, Moussaoui's state-

ment seems more to demonstrate his understanding that his responsibility for 9/11 remained an important issue for sentencing and just how well he understood the distinction between the broad conspiracies to which he had pled guilty and the 9/11 overt acts upon which his eligibility for the death penalty rested.[23]

Finally, we find it significant that Moussaoui never sought to rescind the admissions he had just made, nor to withdraw his guilty plea during the nearly year-long period that elapsed between his plea and the conclusion of the sentencing proceeding. *See* Fed. R. Crim. P. 11(d)(2)(B) ("A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal."). On the contrary, Moussaoui abandoned his "Blind Sheikh" strategy and declined to pursue the "second wave" strategy, opting instead to admit his responsibility for 9/11 in the belief that the jurors would spare his life if he accepted responsibility and gave them reasons to believe that death would be a reward.

---

[23]We also note that we had just discussed such a distinction in *Moussaoui II* and may well have mapped out Moussaoui's strategy for the sentencing at the time. In addressing the Government's argument that, even if exculpatory as to 9/11, the ECWs "testimony would not be material because the conspiracies with which Moussaoui is charged are broader than September 11," we noted "the possibility that Moussaoui may assert that the conspiracy culminating in the September 11 attacks was distinct from any conspiracy in which he was involved" and that "even if the jury accept[ed] the Government's claims regarding the [broader] scope of the charged conspiracy, testimony regarding Moussaoui's non-involvement in September 11 [would be] critical to the penalty phase. If Moussaoui had no involvement in or knowledge of September 11, it is entirely possible that he would not be found eligible for the death penalty." *Moussaoui II*, 382 F.3d at 473. Thus, our opinion would have alerted Moussaoui to the issue of the scope of the conspiracy and the benefits he might derive at sentencing from arguing that the conspiracy in which he was involved was "distinct" from the 9/11 attacks.

To conclude, we hold that the district court properly informed Moussaoui of the nature of the charged conspiracies and ensured that he understood them. Regardless of the precise role the al Qaeda leadership intended Moussaoui to play, or what role he believed he would ultimately play, the facts admitted by Moussaoui were within the scope of the conspiracies charged. There is no indication that Moussaoui, clearly the intelligent and knowledgeable man he was observed to be by the district court, was laboring under any confusion when he signed the Statement of Facts and entered his valid plea of guilty to the conspiracies as charged.

## B.  *Factual Basis For the Plea*

Moussaoui's contention that there was an insufficient factual basis for his guilty plea similarly rests upon his early denials of an intended role in the 9/11 attacks and his claim that the Indictment charged him only with conspiring to participate in them. This argument fails for the same reasons previously discussed.

Rule 11(b)(3) requires the district court to "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). The requirement "ensures that the court make clear exactly what a defendant admits to, and whether those admissions are factually sufficient to constitute the alleged crime." *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991). "The requirement to find a factual basis is designed to protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." *United States v. Mastrapa*, 509 F.3d 652, 660 (4th Cir. 2007) (internal quotation marks omitted). "[T]he trial court has wide discretion when determining whether a factual basis exists." *DeFusco*, 949 F.2d at 120. "[I]t need only be subjectively satisfied that there is a sufficient factual basis for a conclusion that the defendant committed all of the elements

of the offense." *United States v. Ketchum*, 550 F.3d 363, 366 (4th Cir. 2008) (internal quotation marks omitted).

The Statement of Facts adopted by Moussaoui and his representations during the plea colloquy were fully consistent with the charged conspiracies and provided an adequate factual basis for acceptance of the plea. There was no requirement that Moussaoui personally admit to participating in the 9/11 attacks, or that he was intended to be a part of those attacks. And, as noted above, the fact that he was kept separate from the other hijackers and did not know the specifics of the planes operation was, in the circumstances of this case, fully consistent with the operational trade craft of al Qaeda and Moussaoui's training. *Cf. Squillacote*, 221 F.3d at 574. Accordingly, we find no error in this regard.

Moussaoui's claim that there was no factual basis for venue in the Eastern District of Virginia, because there was no factual basis connecting him to the 9/11 attacks, also fails. Venue is proper in any district in which some act in furtherance of the conspiracy was committed. *See United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995). Assuming, without deciding, that the district court would even be bound to find a factual basis for venue during the plea colloquy, Moussaoui is not entitled to relief because at least one overt act taken by the al Qaeda conspirators took place at the Pentagon, in the Eastern District of Virginia.

## C.  *The Possible Sentences*

Finally, Moussaoui asserts that the district court erroneously advised him during the plea colloquy that his only sentencing options were life imprisonment and death, whereas the district court should have informed Moussaoui that a term of years was a possible sentence as well.

As part of the Rule 11 colloquy, the district court "must inform the defendant of, and determine that the defendant

understands, . . . any maximum possible penalty, including imprisonment, fine, and term of supervised release; [and] any mandatory minimum penalty." Fed. R. Crim. P. 11(b)(1)(H) & (I). The district court complied with this requirement, informing Moussaoui that he faced a maximum possible penalty of life without parole or death.

## V.  *Sentencing*

Finally, Moussaoui raises several challenges to his sentence. Before addressing Moussaoui's challenges, we believe it would be helpful to first outline the operation of the Federal Death Penalty Act and describe the proceedings that took place in this case.

## A.

Under the FDPA, the Government must prove a threshold eligibility factor before a defendant may be sentenced to death.[24] *See* 18 U.S.C.A. § 3591(a)(2) (West 2000). If the jury unanimously finds that the Government has established that threshold fact, the jury must make specific findings about the existence of aggravating factors and any mitigating factors and must weigh those factors to determine whether the factors "justify a sentence of death. Based upon this consideration, the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18 U.S.C.A. § 3593(e). In this case, the district court at Moussaoui's request bifurcated the sentencing proceeding, so that

---

[24]The death-eligibility factor asserted by the Government was that Moussaoui "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a result of the act." 18 U.S.C.A. § 3591(a)(2)(C). The "act" that the Government identified was Moussaoui's lies to law enforcement following his arrest, which concealed al Qaeda's ongoing plot.

the jury would first decide whether the Government had proven the threshold eligibility factor and then in a separate proceeding would determine whether a death sentence was justified. The Government and the defense had the opportunity to make opening and closing statements during both phases of the sentencing proceeding.

As outlined above, the FDPA contemplates that the jury will decide whether a defendant should be sentenced to death, to life imprisonment, or to a lesser, term-of-years sentence. Counsel for Moussaoui, however, made the strategic determination that the best chance for avoiding a death sentence was to convince the jury that Moussaoui would spend the rest of his life in prison if the jury declined to impose the death penalty. Accordingly, before opening statements in the first phase of the sentencing, defense counsel requested that the district court instruct the jury that if the jury did not unanimously recommend a death sentence, the district court would then impose a sentence of life imprisonment without the possibility of release. The district court agreed and, at the beginning of the phase I proceedings, gave verbatim the instruction requested by Moussaoui. *See* J.A. 1591 ("If you fail to unanimously find that the government has proved [that Moussaoui is death-eligible] beyond a reasonable doubt, your deliberations are over. The Court will then sentence the defendant to life imprisonment without the possibility of release."). Counsel for Moussaoui emphasized during the first-phase opening statements that Moussaoui would receive a life sentence if he was found not to be eligible for the death penalty, describing Moussaoui as "the man behind [him] in the prison jumpsuit that he will wear for the rest of his life." J.A. 1626. The district court drove the point home, instructing the jury (again, at Moussaoui's request) before the first-phase closing arguments that if the jury failed to find Moussaoui to be death-eligible, "[t]he Court will then sentence the defendant to life imprisonment without the possibility of release." J.A. 4368. The jury unanimously found Moussaoui to be death-eligible on all three counts for which the Government sought the death

penalty, thereby necessitating the second phase of the sentencing proceedings.

Counsel for Moussaoui continued this strategy into the second phase, when the jury was required to make and weigh specific findings as to aggravating and mitigating factors. During this phase, Moussaoui and the Government stipulated that if the jury did not unanimously recommend a death sentence, the district court would "impose a mandatory sentence of life imprisonment without the possibility of parole," J.A. 6507, and the district court gave the jury a similar instruction. Defense counsel's strategy was evidenced during closing argument, when counsel exhorted the jury to "confine [Moussaoui] to a miserable existence until he dies, not the death of a jihadist that he clearly wants, but the long, slow death of a common criminal." J.A. 5481. Defense counsel identified the fact that "if [Moussaoui] is not sentenced to death, [he would] be incarcerated in prison for the rest of his life, without the possibility of release" as a factor mitigating against imposition of the death penalty. J.A. 6737.

At Moussaoui's request, however, the jury was *not* asked to decide unanimously whether Moussaoui should receive life imprisonment – as opposed to a lesser sentence—in the event it did not unanimously recommend the death penalty. The district court instead repeated its previous instructions, informing the jury that if it did not unanimously impose a sentence of death, Moussaoui would be sentenced to life imprisonment without the possibility of release. *See* J.A. 4408G-H ("If the jury has found at least one of the three statutory aggravating factors, then its final job will be to decide whether the defendant should be sentenced to death or life imprisonment without possibility of release."); J.A. 5557 ("If you do not unanimously determine that a sentence of death is justified as to any particular count, that determination constitutes a decision by the jury that the defendant be sentenced to life imprisonment without the possibility of release for that particular

count. And you shall then record your determination with regard to that count on the special verdict form.").

At the conclusion of the second phase, the jury unanimously found that the Government had proven certain statutory aggravating factors for each capital count, as well as several non-statutory aggravating factors. Several jurors also found that Moussaoui had proven several mitigating factors by a preponderance of the evidence, including five jurors who found that the requirement that Moussaoui at least be sentenced to life imprisonment was a mitigating factor. Ultimately, the jury did not unanimously agree to recommend the death penalty.

The district court sentenced Moussaoui the day after the jury returned its verdict. The court adopted the information in the presentence report and utilized a total offense level of 58 and criminal history category of VI, which yielded an advisory guidelines range of life imprisonment. Defense counsel informed the court that they believed that sentence to be a "proper" one. J.A. 5599. At that time, three family members of victims of the 9/11 attacks addressed the court regarding the terrible effects of the attacks. Given the opportunity to allocute, Moussaoui denounced one of the family members as a hypocrite before the district court ruled that the response was an inappropriate political statement. The district court sentenced Moussaoui to life imprisonment without possibility of release on all six counts with the sentence on Count One to be served consecutively to the sentences on the other counts. In so doing, the district court characterized its sentence as "appropriate and fair." J.A. 5613.

B.

On appeal, Moussaoui argues that district court erred by denying his motions for acquittal on the death-eligibility question. Moussaoui contends that the Government's evidence was insufficient to establish as the statutory death-eligibility

factor that Moussaoui committed an act directly resulting in death. Moussaoui also argues that the Government's theory of death eligibility, if upheld, would render the FDPA unconstitutional as applied to him. Because the jury did not sentence Moussaoui to death, we need not consider these claims. The jury's rejection of the death penalty means that Moussaoui's claims are now moot, *cf. United States v. Partida*, 385 F.3d 546, 560 n.10 (5th Cir. 2004) (rejecting sufficiency-of-the-evidence claim as moot where defendant was acquitted of the count being challenged), or, at the very least, that any error was harmless, *see* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded.").

Moussaoui, however, contends that he was prejudiced by the denial of his motion for acquittal because under 18 U.S.C.A. § 3594 (West 2000), the jury's determination that he was death-eligible, combined with the fact that the jury did not unanimously recommend a death sentence, required the district court to impose a sentence of life imprisonment. We disagree.

As discussed above, § 3593(e) provides that if a jury finds a defendant to be eligible for the death penalty, the jury must then by unanimous vote "recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18 U.S.C.A. § 3592(e). Section 3594, in turn, provides that "*[u]pon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without the possibility of release*, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law." 18 U.S.C.A. § 3594 (emphasis added). Because the jury (at Moussaoui's request) was not asked whether it unanimously agreed that Moussaoui should be sentenced to life imprisonment, the jury did not make the § 3593(e) recommendation that would have triggered an automatic life sentence under § 3594. We therefore reject Moussaoui's claim that the submission of the death-

eligibility question to the jury and the jury's subsequent refusal to impose the death penalty combined to require the district court to impose a life sentence.

Independent of his § 3594 argument, however, Moussaoui contends that the district court wrongly[25] believed that a life sentence (as opposed to a term-of-years sentence) was mandated after the jury did not unanimously recommend a sentence of death. Moussaoui therefore contends that a remand for resentencing is required. *See, e.g.*, *United States v. Daiagi*, 892 F.2d 31, 33 (4th Cir. 1989) ("[T]he defendant should be accorded a right to press his petition for a probationary sentence before a court which has not incorrectly assumed that it absolutely lacks the power to impose such a sentence."). Because Moussaoui raises this argument for the first time on appeal, we review for plain error only. *See United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005); Fed. R. Crim. P. 52(b).

Under plain error review, "we must affirm unless an appellant can show that (1) an error was made, (2) it was plain, and (3) it affected the appellant's substantial rights." *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2005). Even if the appellant makes that showing, "the correction of plain error lies within our discretion, which we do not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

In this case, Moussaoui cannot show that a plain error even occurred. An error is plain if it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). As support for his

---

[25]The Government does not argue on appeal that Moussaoui was in fact subject to a mandatory life sentence under any of the counts to which he pleaded guilty. Accordingly, for purposes of this appeal, we will assume without deciding that none of the charges carried a mandatory life sentence.

claim of error, Moussaoui relies on statements made by the district court when accepting Moussaoui's guilty plea. *See, e.g.*, J.A. 1421 ("You are aware that the first four counts essentially expose you to the possibility of a death sentence or life imprisonment without the possibility of parole?"). The Federal Rules of Criminal Procedure, however, require a district court before accepting a guilty plea to inform the defendant of the maximum sentences he faces. *See* Fed. R. Crim. P. 11(b)(1)(H) ("Before the court accepts a plea of guilty . . . . the court must inform the defendant of, and determine that the defendant understands . . . any maximum possible penalty, including imprisonment, fine, and term of supervised release . . . ."). When these statements are read in the context of the Rule 11 proceeding, it is apparent that the district court was simply fulfilling its Rule 11 obligation to inform Moussaoui about the maximum sentences he faced. *See* J.A. 1419 ("I need to go over the indictment with you at this time, the specific charges that are included in the indictment, *the maximum sentences to which you are exposed* with any finding of guilt . . . . (emphasis added)). These statements therefore provide no support for Moussaoui's claim that the district court wrongly believed that a life sentence was mandated once the jury declined to sentence Moussaoui to death. And because Moussaoui has not demonstrated that the district court in fact believed that Moussaoui was not eligible for a term-of-years sentence, he has not carried his burden of establishing the existence of a plain error.[26] *See United States v. Massenburg*,

---

[26]Moussaoui also points to statements made by the district court during the 2002 Rule 11 hearing on Moussaoui's first (but ultimately withdrawn) attempt to plead guilty, when the court explained that the charges carried two "and only two" possible penalties: "either life imprisonment without the possibility of parole or the death penalty." J.A. 524. Putting aside the fact that these statements were likewise made in a Rule 11 proceeding where the court was required to explain the maximum sentences, we question the relevance to our plain-error inquiry of statements made by the district court in connection with an aborted guilty plea that took place *four years* before the actual, effective guilty plea. Moreover, it is only by virtue of the sentencing discretion given district courts by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), that Moussaoui can even

564 F.3d 337, 343 (4th Cir. 2009) ("[T]he *defendant* bears the burden of satisfying each of the elements of the plain error standard.").

Moreover, even if Moussaoui could establish that the district court wrongly believed that Moussaoui could not be sentenced to a term of years, we would not exercise our discretion to correct the error. As discussed above, counsel for Moussaoui repeatedly argued to the jury that Moussaoui would spend the rest of his life in prison if the jury did not sentence him to death, and counsel specifically requested that the jury *not* be asked to recommend, as provided for in § 3593, life imprisonment or a lesser sentence. After the district court at sentencing explained that the guidelines calculation called for a life sentence, counsel for Moussaoui specifically agreed that life imprisonment was warranted: "We believe the sentence is a proper sentence, that he should spend the rest of his life incarcerated for his participation in this conspiracy." J.A. 5599. Because Moussaoui insisted throughout the proceedings below that he would and should receive a life sentence, it would not be appropriate to recognize and correct the alleged error in this case. In this regard, we agree with the sentiments expressed by the Second Circuit when presented with a similar argument:

> [B]ecause defendants, in successfully avoiding the death penalty, made a tactical decision to concede the singular non-capital alternative of a life sentence, we conclude that they cannot now argue that the imposition of such a sentence constitutes plain error. Indeed, if we were to entertain an argument that afforded defendants the possibility of a lesser sen-

---

argue that he could have been sentenced to a sentence of a term of years. Because the first Rule 11 proceeding took place in 2002, when the Sentencing Guidelines were still mandatory, the district court's statements accurately reflected the sentencing options then available.

tence than the one the jury was told would be required when it voted to spare defendants the death penalty, that ruling, and not the challenged life sentences, would raise concerns about the fairness, integrity, and repute of the capital proceeding.

*United States v. Quinones*, 511 F.3d 289, 322 (2d Cir. 2007) (citations and footnote omitted).

## VI.  *The Motion to Remand*

Finally, we briefly address a renewed motion filed by Moussaoui, seeking to remand this case to the district court for consideration of classified information that was discovered and produced by the Government to this court and the district court *after* this appeal was filed.

In connection with the previous proceedings and appeal regarding Moussaoui's access to the ECWs for Rule 15 depositions, the Government advised the district court and this court that there were no recordings of the interrogations of the ECWs by the intelligence agencies. Specifically, in May 2003, in connection with a CIPA hearing conducted by the district court on remand from this court for consideration of substitutions in lieu of access to the witnesses, the district court ordered the Government to determine whether interrogations of the witnesses had been recorded. On May 9, 2003, the Government filed a CIA declaration representing that there were no recordings.

After we issued our opinion in *Moussaoui II* and Moussaoui pled guilty, the district court similarly ordered the Government to determine whether recordings existed of interrogations of additional ECWs (sought in connection with the sentencing proceeding). On November 14, 2005, the Government filed a second CIA declaration representing that there were no such recordings.

On October 25, 2007, during the pendency of the current appeal, the Government *sua sponte* notified the court of the existence of three recordings (two videotapes and one short audiotape) of interviews of one of the ECWs. The Government produced transcripts of the two video recordings to us *ex parte*, asserting that they "ha[d] no bearing on the Moussaoui prosecution" because they "contain[ ] no mention of Moussaoui or any details of the [9/11] plot." J.A. 5629B.[27] The Government explained that "[t]he transcript of the audio tape previously existed and was contained within an intelligence cable." J.A. 5629C.

In December 2007, the Government also disclosed that it had learned that hundreds of hours of videotapes of al Qaeda operative Abu Zubaydah had been destroyed in the fall of 2005. Although Moussaoui had sought access to Zubaydah prior to pleading guilty, the district court found that the defense had failed to demonstrate that Zubaydah could provide material, admissible testimony.[28] The Government also discovered the existence of two videotapes of an al Qaeda operative to whom Moussaoui had first sought access *after* pleading guilty. The transcript of one videotape was submitted *ex parte* to the court, along with the substitution for the

---

[27]A redacted copy of the letter was provided to defense counsel. The transcripts were submitted *ex parte* under CIPA § 4 because they "address-[ed] . . . national security matters for which defense counsel lack[ed] a need to know." J.A. 5629C.

[28]In a subsequent letter, the Government advised that a former prosecutor in Moussaoui's case may have been told in late February or early March 2006 about videotapes of Abu Zubaydah and their destruction. The prosecutor was one of three AUSAs working on the Moussaoui case, but does not recall being told this information. Another AUSA, who was not on the prosecution team, learned of the videotapes in connection with work he performed on an unrelated project and recalls bringing the matter to the prosecutor's attention, again in connection with work unconnected with Moussaoui's case. In any event, this alleged notification also post-dated Moussaoui's guilty plea and involved a witness that the district court had previously determined was not material.

witness's testimony prepared for the sentencing proceeding. The second videotape had not yet been located.

Moussaoui filed a motion for limited remand, requesting that we remand the case to the district court for an investigation and determination of what recordings existed, the content of the recordings, and whether the Government had access to them to determine whether this could have affected the knowing and voluntary nature of Moussaoui's guilty plea. In January 2008, we denied Moussaoui's motion for a limited remand and denied Moussaoui's motion for access to the classified tapes and transcripts.

After our decision, the Government located the second videotape of the al Qaeda associate to whom Moussaoui had sought access *post-plea*, and submitted this transcript to us *ex parte* as well. As represented by the Government, this transcript also makes no mention of Moussaoui or any details of the September 11 terrorist attacks.[29]

Since our decision, an Acting United States Attorney was appointed to investigate missing or destroyed tapes of al Qaeda detainee interrogations. In July 2008, the Government requested an extension of its briefing deadline pending its receipt of information from the tapes investigation that might or might not be relevant to the issues that had been raised in Moussaoui's motion to remand and on appeal. Although no new information was disclosed at the time, Moussaoui renewed his motion for limited remand. We denied the motion as premature, without prejudice to Moussaoui's right to raise the issue again after briefing. He has now done so.

We have reviewed the classified information submitted by the Government *ex parte* and *in camera* since our prior deci-

---

[29]Counsel for Moussaoui filed a motion for partial relief from the Protective Order to allow them to discuss this classified information with Moussaoui, which we also denied.

sion pertaining to the motion to remand, and find no need for further proceedings before the district court. We previously denied Moussaoui's motion to remand based upon the three recordings of the ECW that Moussaoui sought access to pre-plea, satisfied from our *in camera* and *ex parte* review that they presented no information relating to Moussaoui, the planes operation, or the 9/11 attacks. Accordingly, even if we were to allow a challenge to the guilty plea for an alleged *Brady* violation, the information produced is not *Brady* material.[30] We have also reviewed *in camera* and *ex parte* transcripts of the recordings of the ECW to whom Moussaoui first sought access post-plea and find them to be similarly devoid of any exculpatory material.

Moussaoui's request that we remand to the district court for further inquiry into the destruction of the Zubaydah recordings was denied in our prior ruling. Moussaoui first sought access to Zubaydah prior to his guilty plea but was denied access based upon the district court's determination that he was not a material witness. Contrary to Moussaoui's attempts to suggest otherwise, the district court made its determination based upon an *ex parte* review of the interrogation summaries submitted by the Government and did not inquire about or order the production of recordings of Zubaydah. The issues surrounding the existence of recordings of Zubaydah were

---

[30]To the extent that Moussaoui argues that the existence of these recordings may have impacted his decision to plead guilty because it might have affected his evaluation of the reliability of the summaries of this witness's testimony, we are unpersuaded. We previously explained why the intelligence summaries, upon which the substitutions were to be based, carried sufficient indicia of reliability to alleviate concerns in this regard. *See Moussaoui II*, 382 F.3d at 478. Although we, like the district court, inquired at the time about the existence of recordings that could be compared to the source material, our decision was not dependent upon the absence of any such recordings. Furthermore, as noted earlier, Moussaoui short-circuited this entire CIPA process by demanding to plead guilty before it was completed. And, once the process was completed and the substitutions provided, Moussaoui made no effort to withdraw his plea.

first raised on May 2, 2005, when the district court asked the Government to disclose whether interrogations of detainees existed in connection with Moussaoui's motion for reconsideration of the district court's earlier denial of access to Zubaydah. In the fall of 2005, the Government agreed to produce discovery of any statements by Zubaydah relating to the 9/11 operation or to Moussaoui, although it continued to oppose access to him. It was also in the fall of 2005 that the tapes were allegedly destroyed. However, this all occurred well after Moussaoui entered his guilty plea and waived his right to challenge such pre-plea rulings by the district court. And there is nothing to indicate that Zubaydah actually possessed evidence that would have been material or favorable to Moussaoui during the guilt phase.

For the foregoing reasons, even if we were to allow a *Brady*-type challenge to his guilty plea based solely upon the failure of the prosecution to produce exculpatory evidence, Moussaoui has failed to demonstrate that the Government withheld exculpatory material that would have caused Moussaoui to forego his guilty plea and proceed to trial, much less evidence of his actual innocence. Should that change, as a result of the ongoing tapes investigation or otherwise, Moussaoui, like every other criminal defendant, has collateral avenues for raising such claims. In the meantime, the finality of the guilty plea, entered knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences, stands.

## VII.   *Conclusion*

For the reasons set forth above, we affirm Moussaoui's convictions and sentences in their entirety. We also deny his renewed motion to remand for further proceedings.

*AFFIRMED*